UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>HELIOS AND MATHESON, ANALYTICS, INC.,<br>*a/k/a MovieFone*, et al.,[1]<br><br>Debtors. | Chapter 7<br><br>Case No. 20-10242-smb<br>(Jointly Administered) |
| ALAN NISSELSON, as Chapter 7 Trustee<br>of HELIOS AND MATHESON ANALYTICS,<br>INC., a/k/a MovieFone and MoviePass, Inc.,<br><br>v.<br><br>Theodore Farnsworth,<br>Stuart Benson, Mitchell Lowe,<br>Muralikrishna Gadiyaram,<br>Parthasarathy Krishnan,<br>Prathap Singh, Gavriel Ralbag,<br>Carl Schramm, Christopher Kelly,<br>Maria Stipp and Joseph Fried | Adv. Proc. No. _____ |

## ORIGINAL COMPLAINT

-------------------------

[1] The Debtors in the jointly administered Chapter 7 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows:  Helios and Matheson Analytics, Inc., a/k/a MovieFone (9913), Zone Technologies, Inc., a/k/a Red Zone, a/k/a Zone Intelligence, (5124), and MoviePass, Inc. (9893).

# TABLE OF CONTENTS

**PAGE**

ORIGINAL COMPLAINT ................................................................................................ 1

SUMMARY OF ACTION .............................................................................................. 1

JURISDCITION ............................................................................................................. 7

PARTIES ...................................................................................................................... 8

   I.   HM ACQUIRED AND FINANCED MP ................................................... 10

      A.   HM and MP Prior to HM's Acquisition of MP .................................... 10

      B.   HM Paid Approximately $140 million to Acquire MP ........................ 11

      C.   HM Raised Hundreds of Millions of Dollars in Capital To Purchase
          and Support MP ................................................................................ 12

   II.   HM RECKLESSLY POURED OVER $187 MILLION INTO MP BETWEEN
       APRIL AND SEPTEMBER 2018 ............................................................ 13

   III.   IN THE FACE OF RED FLAGS, THE D&OS CAUSED MP TO STICK
       TO AN IRRATIONAL AND FAILED BUSINESS MODEL THAT LED TO
       MASSIVE LOSSES .............................................................................. 14

      A.   The MP Pricing Plan Did Not Work ................................................. 14

      B.   D&Os Knew Critical Deals with the Big Three Were Impossible ...... 26

      C.   Neither MP Nor HM Had Revenue-Producing Data Analytics and the D&Os
          failed to Cause MP and HM to Develop Them ................................. 29

   IV.   RATHER THAN ADDRESS PROBLEMS, THE PRIMARY HM AND MP
       DIRECTORS USED HM AND MP FOR THEIR OWN BENEFIT: DERELICT
       HM AND MP DIRECTORS DID NOTHING TO STOP THE CONDUCT ............. 35

      A.   The D&Os Engage in and/or Permit Unfair Insider Deals That Harmed HM .... 35

      B.   The D&Os Engage in and/or Permit Lavish and Uncontrolled Expenses as
          They Drained MP of Resources ........................................................ 37

      C.   HM and MP Board Members Abrogated their Duties and Failed to Attend to
          These Issues .................................................................................... 41

   V.   AFTER CAUSING HM'S AND MP'S DEMISE, THE D&Os CONTINUED
       TO DESTROY THE REMNANT VALUE IN HM AND MP .................................. 45

      A.   The D&Os Had Caused HM to Cut Off Its Access to Capital and Creditors
          Demanded Payment ......................................................................... 45

      B.   The MP D&Os Recklessly Allowed an MP Data Breach ................... 48

      C.   HM D&Os Allow Farnsworth to Use Remaining MP Assets for Personal
          Gain ................................................................................................. 49

D.   The D&Os' Failures and Improper Tactics Lead to Time Consuming
      and Costly Consumer Lawsuits and Government Investigations........................ 51

VI.  DAMAGES CAUSED TO HM AND TO MP ............................................................ 53

COUNT 1 BREACH OF FIDUCIARY DUTIES OF LOYALTY, CARE AND
         GOOD FAITH AGAINST HM OFFICERS: FARNSWORTH,
         BENSON AND KRISHNAN.................................................................. 54

COUNT 2 BREACH OF FIDUCIARY DUTIES OF LOYALTY AND GOOD
         FAITH AGAINST PRIMARY HM DIRECTORS FARNSWORTH
         AND GADIYARAM ............................................................................ 55

COUNT 3 BREACH OF FIDUCIARY DUTIES OF LOYALTY AND GOOD
         FAITH AGAINST DERELICT HM DIRECTORS: SINGH,
         SCHRAMM, RALBAG, AND FRIED.................................................. 57

COUNT 4 BREACH OF FIDUCIARY DUTIES OF LOYALTY, CARE AND
         GOOD FAITH AGAINST MP OFFICERS: BENSON AND LOWE ... 58

COUNT 5 BREACH OF FIDUCIARY DUTIES OF LOYALTY AND GOOD
         FAITH AGAINST PRIMARY MP DIRECTORS: FARNSWORTH
         AND LOWE........................................................................................ 59

COUNT 6 BREACH OF FIDUCIARY DUTIES OF LOYALTY AND GOOD
         FAITH AGAINST DERELICT MP DIRECTORS: KELLY,
         SCHRAMM AND STIPP ..................................................................... 61

COUNT 7 CORPORATE WASTE OF HM AGAINST THE HM D&OS ............. 63

COUNT 8 CORPORATE WASTE OF MP AGAINST THE MP D&OS .............. 64

COUNT 9 UNJUST ENRICHMENT ASSERTED BY HM AGAINST
         GADIYARAM AND FARNSWORTH.................................................. 64

COUNT 10 THROUGH COUNT 15 OBJECTIONS TO CLAIMS ....................... 65

TOLLING OF LIMITATIONS ............................................................................. 67

PRAYER  .............................................................................................................. 68

Alan Nisselson ( "**Trustee**"), as chapter 7 trustee of the estates of Helios and Matheson Analytics, Inc. ("**HM**"), and MoviePass, Inc. ("**MP**") (together, the "**Debtors**"), as and for his Original Complaint ("**Complaint**") against the above-captioned former directors and officers of HM (the "**HM D&Os**") and MP (the "**MP D&Os**") (collectively, "**D&Os**" or the "**Defendants**") alleges the following:

## SUMMARY OF ACTION

1.      In late 2017, HM, a publicly traded "technology company," purchased a controlling interest in MP, a movie subscription service. To attract subscribers, MP slashed the subscription fee it charged customers to a bargain basement price. By April 2018, numerous red flags made it clear to the MP D&Os that MP's "too-good-to-be true" subscription fee model could not work. Rather than address that reality, the MP D&Os recklessly exacerbated MP's problems or simply ignored them.

2.      In April 2018, the HM D&Os knew that the MP D&Os were reckless and that MP's business had failed. Yet from April to September 2018, the HM D&Os caused HM to irrationally pour over $187 million into MP with no return. Ted Farnsworth, the Chief Executive Officer of HM and a board member of HM and MP with a track record of pump and dump schemes, led the charge. The other HM D&Os actively participated in or failed to stop the reckless and wasteful dissipation of HM's assets. In breach of their duties of care, loyalty and good faith, the D&Os wasted $187 million in transfers to MP and destroyed the pre-purchase value of MP.

3.      MP had a business befitting its name—it used a debit card and a mobile application to charge subscribers a monthly fee to view movies at theaters. The customer would check into a specific movie using the application, and MP would load the user's debit card with the amount necessary to pay for the movie at the theater. After HM agreed to acquire MP in August 2017, the

1

MP D&Os altered MP's strategy. Mitch Lowe, the Chief Executive Officer of MP, lowered the monthly fee MP charged from about $40-50 per month (depending on location) to a mere $9.95 per month. In return for this low price, customers were given the right to an *unlimited*, rather than a fixed, movie plan. MP advertised that users could get "any movie, any theater, any day." But MP remained on the hook to pay the theaters the full cost of the tickets requested by its customers, averaging about $10 each. Under this plan, if a subscriber saw three movies in a month, MP paid $30/month and received $9.95/month in revenue. As one financial analyst described it, MP was "selling dollars for quarters."

4.     Subscribers leapt at the chance to partake in this unimaginable bargain. MP grew its subscriber list from less than 200,000 in August 2017 to almost 3 million by April 2018. Not surprisingly, this growth caused massive losses—well over $100 million in the first quarter of 2018 alone, with only hundreds of millions of dollars of increasing losses in sight.

5.     By April 2018, numerous red flags warned the D&Os that the "dollars for quarters" business model would never work. While the D&O's pricing plan may have initially been simply ill-conceived, their reckless acts and omissions in the face of these red flags clearly crossed the line to breaches of fiduciary duty.

6.     *First*, by April 2018, it was obvious that the D&Os' premise that most movie goers, like gym members, would use the card sparingly was blatantly false. Instead, a large portion of MP users, lured by the promise of unlimited movies, took full advantage of the terms of use. The D&Os were caught off guard, pejoratively referring to their most devoted customers as "super users," "over eaters," "bad apples" and "abusers." Temporary and erratic repricing efforts failed, and the D&Os struggled with the massive losses that accompanied high usage. As Khalid Itum, MP's Vice President of Business Development, put it, MP's "yoyo" strategy was "not a way to

run a business." But rather than address what they now knew to be a fatally flawed plan, certain of the D&Os took increasingly desperate measures to limit their customers from using their product. Farnsworth and Lowe caused MP to improperly "gray out" certain high-demand movies, "reset" passwords of heavy users, require "ticket verifications," institute "trip wires," and block specific movies, theaters, and showtimes. Once subscribers began to realize that the service was not being provided as advertised, they became enraged, and millions of subscribers canceled their memberships. These actions eventually caught the attention of the Federal Trade Commission ("**FTC**") and other government agencies. In the summer of 2018, the crisis peaked when MP ran out of cash, and MP's credit card processor temporarily shut MP down due to missed payments. The MP D&Os could no longer hide behind what the press had dubbed "MoviePass math."

7.      *Second*, the D&Os claimed MP needed to acquire millions of followers through MP's low-priced plan to do deals with the three largest movie theater chains for reduced ticket prices and concessions revenue. But by April 2018, at a time when MP had already acquired millions of followers, it was clear to the D&Os that MP was never going to reach agreements with the "Big Three" exhibitors—AMC, Regal, and Cinemark—MP's only potential path to profitability. The Big Three detested the new MP (post-HM's acquisition) and its nonsensical plan. They made it clear to the D&Os that they would never offer MP reduced ticket prices or a share of concession revenue; instead, they adopted their own competing subscription plans. As one Amazon Studios representative said to MP's Director of Business Development, MP was known in the marketplace as being "toxic," and the Big Three would not deal with MP or its partners. By the summer of 2018, MP was simply a "cancer" in the eyes of the industry. While the MP D&Os called MP an industry "disruptor," they knew that without a deal with one of the Big Three, MP's financial model was unsustainable. By April 2018, it was clear that no disruption would ever occur.

3

8.      *Third*, by April 2018, MP had failed to develop any significant data-related revenue, which MP desperately needed and which the D&Os knew would never materialize. While as early as 2017, certain of the D&Os publicly touted MP's data collection capabilities as a critical source of potential revenue, neither MP nor HM had any workable plan to monetize the data MP collected. The D&Os peppered their explanations of MP's business activities with references to MP's and HM's "data analytics," "data mining," and "artificial intelligence" capabilities that would catapult MP to profitability through data licensing and targeted advertisements. But MP had little useful data, and its own privacy policy limited how it could use the data it had. Moreover, the D&Os failed to cause MP to make timely efforts to properly collect and anonymize its data or otherwise develop its data licensing and advertising capability. Despite that, Farnsworth, Lowe and Stuart Benson, the Chief Financial Officer of HM and MP, pressured employees to pump up financial projections to show hundreds of millions in data-related revenue, and derelict MP directors, Carl Schramm, Christopher Kelly and Maria Stipp did nothing to ensure that an even remotely realistic and rational data plan existed. By the time MP hired a Chief Data Officer in May 2018, it was too little too late. Already drained of cash and funding options, MP had few employees qualified to work with the data, no data reports, no proprietary algorithms, no artificial intelligence, and only a small handful of insignificant data licensing and advertising deals.

9.      *Fourth*, in the face of massive losses, certain D&Os recklessly authorized lavish compensation packages and high-flying entertainment expenses and paid an insider for a sham consulting agreement. HM paid for Farnsworth's New York City apartment, his salary, his car, and a $1.5 million cash bonus in 2018, even as red flags continually arose. Farnsworth traveled in a Gulfstream jet and caused HM companies to pay monies to "Day Dreamer Yacht Charter," Farnsworth's yacht company. Millions of dollars were spent socializing at Coachella, Sundance

Film Festival, Tribeca Film Festival, and Cannes Film Festival with no specific business purpose, and Farnsworth insisted on attending the Oscars on HM's dime, even when HM could barely pay its bills. Murali Gadiyaram extracted funds from HM through a purported data consulting agreement, despite the utter lack of any data-related strategy. The massive losses created by the continuation of MP's absurd pricing, and lack of Big Three, data, or advertising deals were exacerbated by the reckless and self-indulgent spending and insider deals by certain D&Os.

10.     Despite these many red flags, and without any procedures in place to address the myriad of problems staring them in the face, the D&Os did nothing to halt the reckless dissipation of assets. By repeatedly diluting HM's equity, Farnsworth and Benson caused HM to transfer hundreds of millions of dollars to MP, including over $187 million *after* it was clear MP could not survive. Carl Schramm, who served as a director of both HM and MP, focused on promoting his new book (about entrepreneurial businesses) through MP rather than tending to MP's business. Gadiyaram, who was busy defending fraud allegations in India against him and his company Helios and Matheson Information Technology Ltd. (HM's former parent), convinced HM to pay his legal fees. Prathap Singh and Gavriel Ralbag simply abrogated their duties. Christopher Kelly, MP's Chairman, failed to do anything about known problems at MP, and Maria Stipp, another MP director, blindly signed off on transactions until it was too late.

11.     HM raised the hundreds of millions of dollars that it poured into MP through convertible debt and equity offerings that repeatedly diluted HM's equity. By September 2018, HM no longer had access to capital. The convertible debt and equity offerings had increased HM's total outstanding shares from seven million in August 2017 to 1.36 billion in September 2018. On July 27, 2018, after MP suffered a service outage when it ran out of money to pay its credit card processors, HM's stock price dropped from $4.83 to $2.00. By September 2018, HM stock had

plummeted to two cents a share. As described in an August 2018 Wall Street Journal article: "Helios's stock rose and then quickly fell, as short sellers bet the service couldn't stay in business long, if it continued effectively selling tickets for less than it paid for them."

12.     By fall 2018, convertible noteholders converted their debt to non-convertible instruments and sought payment of amounts due. In December 2018, Benson belatedly warned the D&Os that HM and MP were in the zone of insolvency and that MP could not survive on its own. Having ruined a valuable company, the D&Os made no efforts to preserve any remaining value of MP. MP struggled to pay creditors, and the D&Os' time and attention turned to defending investigations by the FTC and state and federal law enforcement agencies, as well as myriad lawsuits by subscribers and investors. To further exacerbate their problems, the MP D&Os recklessly permitted a database with private user information to remain exposed for months during 2019, despite warnings about the data breach, and dragged their feet in addressing it. In mid-2019, in a final reckless and self-interested scheme, Farnsworth diverted MP's assets and resources to try to start a new company for himself, and then attempted to buy the remaining scraps. In 2019, Fried, the new HM director that replaced Schramm, joined the ranks of the other derelict HM directors and did nothing to stop misconduct.

13.     The D&Os liked to imagine that MP was another Amazon, Uber, or Netflix, and that, like those companies, its losses would eventually lead to great profits. But they willfully ignored critical differences. While MP had large losses, there was no profit (or even breakeven point) in sight and red flags clearly indicated that all previously conceived paths for the business had failed. By April 2018, it was clear that the fantasy of being the next Uber or Netflix was dead. The HM D&Os knew that MP's business model was irrational and unsustainable, and that MP D&Os' grossly negligent and reckless conduct was only exacerbating the problem. The HM D&Os

damaged HM by at least $187 million, the amount HM poured into MP from April to September 2018. The reckless acts of the MP D&Os and the failure of oversight by HM directors also destroyed the pre-purchase value of MP, HM's primary asset, in an amount to be shown at trial.

## **JURISDCITION**

14.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 157(a) and 1334(b), in that the Complaint asserts causes of action arising in, arising under and/or relating to the above-captioned bankruptcy case.

15.      By virtue of 28 U.S.C. § 157(a) and the Amended Standing Order of Reference dated January 31, 2012 of Chief Judge Loretta A. Preska of the District Court, this proceeding is automatically referred to the United States Bankruptcy Court for the Southern District of New York.

16.      This adversary proceeding is a core proceeding under 28 U.S.C. §§ 157(b)(2) to be heard and determined by this Court and this Court may enter final orders for matters therein. In the alternative, this proceeding is a "related to" proceeding under 28 U.S.C. §§ 157(a).

17.      This Court has personal jurisdiction over the Defendants. *First*, service on all Defendants will be made by first class mail in accordance with Federal Rule of Bankruptcy Procedure ("**Bankruptcy Rules**") 7004. *Second*, most of the Defendants have filed motions for relief from the automatic stay to permit use of insurance policy proceeds, and certain Defendants filed proofs of claim against HM and/or MP, thereby submitting themselves to the jurisdiction of this Court. *Third*, the Defendants have the requisite contacts to support personal jurisdiction in this Court. *Fourth*, the Defendants have purposefully directed their activities toward HM and MP, which were Delaware corporations headquartered in New York, and those activities are the subject of this action.

18.     Venue for the action is proper in this Court under 28 U.S.C. § 1409(a), as the action is commenced in the district in which the above-captioned bankruptcy case is pending.

19.     The Trustee consents to the entry of final orders or judgments by this Court if it is determined that, absent consent of the parties herein, this Court cannot enter final orders or judgments consistent with Article III of the United States Constitution.

## PARTIES

20.     The Trustee, **Alan Nisselson**, is the chapter 7 trustee of the estates of the Debtors. On January 28, 2020, the Debtors commenced Chapter 7 petitions for relief under chapter 7 of title 11 of the United States Code. Upon his appointment, he became empowered to administer all assets of the estate, including the causes of action and claims set forth in this Complaint.

21.     **Theodore Farnsworth** ("**Farnsworth**") is a citizen of the state of Florida and may be served in accordance with the Bankruptcy Rules. He served as a member Board of Directors ("**BOD**") of HM and MP and as HM's Chief Executive Officer ("**CEO**") during events described in this Complaint.

22.     **Stuart Benson** ("**Benson**") is a citizen of New Jersey and may be served in accordance with the Bankruptcy Rules. Benson served as Chief Financial Officer ("**CFO**") of HM and MP during events described in this Complaint.

23.     **Mitchell Lowe** ("**Lowe**") is a citizen of the state of California and may be served in accordance with the Bankruptcy Rules. He was the CEO of MP and a member of its BOD during events described in this Complaint. (Lowe and Benson, the "**MP Officers**", and Farnsworth and Lowe, as to specific acts described herein, the "**Primary MP Directors**").

24.     **Muralikrishna Gadiyaram a/k/a Murali Gadiyaram** ("**Gadiyaram**") is a citizen of the state of California and may be served in accordance with the Bankruptcy Rules. Gadiyaram

8

was a member of the BOD of HM during events described in this Complaint. (Farnsworth and Gadiyaram, as to specific acts described herein, the "**Primary HM Directors**").

25.    **Parthasarathy Krishnan a/k/a Pat Krishnan** ("**Krishnan**") is a citizen of the state of California and may be served in accordance with the Bankruptcy Rules. He was Chief Innovation Officer of HM and interim CEO and CFO of HM during events described in this Complaint. (Krishnan, Benson and Farnsworth, the "**HM Officers**").

26.    **Prathap Singh** ("**Singh**") is a citizen of the state of New Jersey and may be served in accordance with the Bankruptcy Rules. He was a member of the BOD of HM during events described in this Complaint.

27.    **Gavriel Ralbag** ("**Ralbag**") is a citizen of the state of New York and may be served in accordance with the Bankruptcy Rules. He was a member of the BOD of HM during events described in this Complaint.

28.    **Carl Schramm** ("**Schramm**") is a citizen of the state of Maryland and may be served in accordance with the Bankruptcy Rules. He served as a member of the BOD of HM and MP during events described in this Complaint.

29.    **Christopher Kelly** ("**Kelly**") is a citizen of the state of California and may be served in accordance with the Bankruptcy Rules. Kelly served as a member of the BOD of MP during events described in this Complaint.

30.    **Maria Stipp ("Stipp")** is a citizen of the state of California and may be served in accordance with the Bankruptcy Rules. Stipp served as a member of the BOD of MP during events described in this Complaint. (Schramm, Kelly and Stipp, as to specific acts described herein, the "**Derelict MP Directors**").

31.    **Joseph Fried** ("**Fried**") is a citizen of the state of New Jersey and may be served in accordance with the Bankruptcy Rules. He was a member of the BOD of HM during events described in this Complaint. (Singh, Ralbag, Schramm and, beginning on January 1, 2019, Fried, as to specific acts described herein, the "**Derelict HM Directors**").

## I.    HM ACQUIRED AND FINANCED MP

### A. HM and MP Prior to HM's Acquisition of MP

32.    HM was a publicly traded company founded in 1983. HM acquired interests in technology companies but did not develop any products or services itself. Its former parent corporation was Helios and Matheson Information Technology Ltd. ("**HMIT**"), an Indian IT trading firm headed and largely owned by Gadiyaram. HMIT had a checkered history and had been accused of defrauding creditors in India.

33.    In November 2016, HM merged with Zone Technologies, Inc. **("Zone"),** a Florida tech company run by Farnsworth. Zone's primary business was developing RedZone Maps, described in SEC filings as a "GPS-driven, real-time crime and navigation map application." From January 2016 until the November merger, Zone had zero revenue and $1.5 million in expenses. The acquisition of Zone allowed HM to meet the minimum $2.5 million market cap requirement to remain listed on the NASDAQ.

34.    After the merger, HMIT and Farnsworth each owned approximately 39% of HM. This gave Gadiyaram, HMIT's largest owner, and Farnsworth substantial control over HM's business, including the selection of board members and officers. In January 2017, Farnsworth was appointed CEO of HM. At that time, HM's BOD included Farnsworth as Chairman, Gadiyaram, Singh, Ralbag, and Schramm. That composition remained through most of 2018, and in 2019 Fried took over for Schramm who had resigned earlier.

35.     Stacey Spikes and Hamet Watt founded MP in 2011. After experimenting with different models, MP eventually offered subscribers admission to participating movie theaters in return for a monthly fee. MP generally had to purchase the tickets from movie theater chains on behalf of its subscribers at full cost. Starting in June 2016, MP used a tiered pricing system, whereby an unlimited subscription cost $40-$50 per month and a capped subscription (two or three movies per month) cost $15-31 per month, based on the average cost of movie tickets in the subscriber's city. While MP had fewer than 20,000 subscribers at the time HM acquired MP in August 2017, MP had operated for years and had substantial value.

**B. HM Paid Approximately $140 million to Acquire MP**

36.     HM obtained an interest in MP in several stages. On August 15, 2017, HM entered into a Securities Purchase Agreement ("**SPA**") to purchase 51% of MP's common stock. The SPA was amended on October 6, 2017 to raise HM's share in MP to 53.71%. Pursuant to an October 11, 2017 Original Option Agreement, HM increased its share in MP to 62.4%, and in March 2018 and April 2018, HM raised its ownership to 81.2% and 91.8%, respectively.

37.     Pursuant to the SPA, as amended, HM acquired 53.71% of MP in return for a convertible note issued by HM in the amount of $12 million, a non-convertible note in the amount of $5 million, an $11.5 million loan from HM to MP in exchange for a note from MP to HM that was cancelled upon closing, and the purchase of a $1 million note issued by MP to Kelly that was convertible into 2% of HM's stock. Some of the payments were conditioned on MP reaching certain milestones based on the number of MP subscribers obtained. The SPA specified that Lowe would be CEO of MP and Farnsworth would be CEO of HM.

38.     The consideration for the October Original Option Agreement, which increased HM's interest in MP to 62.4%, consisted of cancellation of a $12.15 million MP Option Note and

a $7.85 million cash payment. In March 2018, in lieu of a repayment of $55.525 million in HM's advances made to MP, HM acquired an additional 18.79% of MP, increasing its total stake to 81.2%. Shortly thereafter, in lieu of repayment of $35 million in further advances to MP, MP issued an additional 10.6% of its common stock to HM, bringing HM's total ownership of MP up to 91.8%. By the time HM completed its acquisition, HM had paid approximately $140 million for 91.8% of MP. MP's BOD then included Farnsworth, Lowe, Schramm, Kelly and Stipp.

**C.  HM Raised Hundreds of Millions of Dollars in Capital To Purchase and Support MP**

39.     After execution of the SPA, HM raised hundreds of millions of dollars from debt and equity offerings, almost all of which HM invested in MP. This included monies raised from three sets of convertible notes in November 2017, January 2018, and June 2018. On November 6, 2017, HM issued Convertible Notes in the amount of $100 million in exchange for $5 million in cash and an Investor Note in the amount of $95 million. In the third and fourth quarters of 2018, investors paid down $58,959,736 in principal and interest on these Investor Notes. In January 2018, HM issued $60 million of Senior Secured Convertible Notes in exchange for $25 million in cash and a $35 million Investor Note. During the third quarter of 2018, HM received a $6 million payment on this Investor Note. On June 21, 2018, HM issued $164 million of secured convertible notes at 15% original issue discount (the Convertible Notes collectively, the "**Convertible Notes**"). The buyers paid for these Convertible Notes through a cash payment of $20.5 million and a $139.4 million Secured Investor Note. As of September 2018, $24.6 million of these Investor Notes had been prepaid. The November 2017, January 2018, and June 2018 Investor Notes are collectively referred to as the "**Investor Notes**".

40.     HM also raised $244 million in proceeds from equity offerings between February and September 2018. In February 2018, HM did a public offering of common stock and warrants

and raised $96,912,380. On April 23, 2018, HM did another public offering of common stock and warrants and raised $27,677,558. That same month, HM entered into an Equity Distribution Agreement under which HM could offer and sell under a shelf registration statement up to $150,000,000 of its common stock at prevailing market prices in a continuous at-the-market offering through its sales agent Canaccord Genuity LLC. As of September 30, 2018, HM had sold approximately 627,933,083 shares, and raised $119,423,879 under the at-the market offering. This Equity Distribution Agreement was terminated on October 1, 2018.

## II.    HM RECKLESSLY POURED OVER $187 MILLION INTO MP BETWEEN APRIL AND SEPTEMBER 2018

41.    The monies raised from the Convertible Notes and Equity Offerings were used almost exclusively to fund MP, which MP quickly wasted through the reckless perpetuation of its failed business. Until mid-April 2018, HM's advances were used to increase HM's interests in MP. In January 2018, HM advanced $55.525 million to MP to provide working capital and operational requirements to MP and to support MP's business plans and objectives. As explained above, that debt was later exchanged for 18.79% of MP common stock. From March 1, 2018 to April 12, 2018, HM advanced another $35 million to MP for operating purposes, which was later exchanged for another 10.6% of MP common stock.

42.    Thereafter, between April 16, 2018, and September 30, 2018, HM transferred to MP a total of $187,285,000 ("**Reckless MP Transfers**"), in 91 separate advances. The advances, broken down by month, were as follows:

| April 16-30 | $ 26,200,000 |
|---|---|
| May | $ 42,375,000 |
| June | $ 44,156,000 |
| July | $ 32,029,000 |
| August | $ 31,470,000 |
| September | $ 11,055,000 |
| **Total** | **$187,285,000** |

As explained below, the HM D&Os knew that the cash HM contributed to MP from April 2018 onward was wasted, or they turned a blind eye to the waste, because it was clear MP would never succeed; indeed, these transfers caused losses and represented a dissipation of HM's assets. The Reckless MP Transfers were never discussed by HM's BOD, nor was any process adopted to raise issues or create requirements before releasing the Reckless MP Transfers. Instead, the HM D&Os caused HM to make these advances to MP after a short, usually one-line request of Benson or another MP officer that occasionally included Farnsworth or Lowe. The D&Os engaged in no meaningful discussion about the wisdom of the Reckless MP Transfers, which dissipated HM cash that could have easily been preserved.

III. **IN THE FACE OF RED FLAGS, THE D&OS CAUSED MP TO STICK TO AN IRRATIONAL AND FAILED BUSINESS MODEL THAT LED TO MASSIVE LOSSES**

A. **The MP Pricing Plan Did Not Work**

43.     At the time HM entered into the SPA with MP, the D&Os implemented a new business model. An August 15, 2017 press release announced that MP would reduce its fee for an unlimited subscription from about $40-50 per month (depending on location) to $9.95 per month. In return for this low price, MP offered subscribers "unlimited movies with no blackout dates" and "no contracts." By April 2018, the HM D&Os knew their "absurd" business model had failed and would never work.

44.     While movie prices varied according to movie theater location, the average cost of a movie ticket was about $10. The new business model required that MP buy tickets at this price each time a subscriber wanted to view a movie by MP loading the user's debit card with the amount necessary to pay for admission. The income MP received from subscribers for those purchases was $9.95 per month (or less for annual subscribers and during promotions) regardless of how many

times the subscriber used the service. In other words, MP set the monthly price so low that it baked in a loss if the average subscriber used the service slightly more than once a month. If a subscriber saw 3 movies that month, MP would pay 30 dollars and still receive only $9.95. If the subscriber fully utilized the unlimited subscription and saw many movies per month, MP's losses multiplied.

45.    Once this new model was implemented, it quickly became clear to the D&Os that their pricing was built on a faulty premise. The MP D&Os set the price to attract subscribers, assuming that most subscribers would infrequently use the service so MP's losses would be manageable. But to the contrary, excited about this unrealistic bargain, subscribers did just the opposite. As MP grew subscribers from less than 20,000 in August 2017 to almost 3 million by April 2018, many of those subscribers used the card frequently. The MP D&Os should have expected this, given that MP specifically advertised the unlimited nature of the service to potential subscribers, such as "no blackout dates: See a 2D movie every day" and "unlimited access to movies in theaters." In any event, what they did not appreciate during the conception phase soon became clear as red flags pointed to the reality of its failure.

46.    As early as November 2017, HM's Vice President of Analytics Kiran Srinivas ("**Srinivas**") emailed Farnsworth, Lowe and Drew Osumi (Farnsworth's Chief of Staff) (the "**Srinivas Email**") to highlight issues created by subscribers that legitimately but frequently used Movie Pass. MP officers derisively referred to these subscribers as "heavy users," "super users," "bad apples" "abusers" and "over eaters." Srinivas warned that Wall Street was alarmed by MP's heavy users, saying that Wall Street believed that the heavy users would "DESTROY the margin potential for MP," and that Wall Street was "concerned about whether there is enough liquidity to fund the initial negative gross margins." He stressed that those on Wall Street "NEED TO KNOW how the future will offset the current losses."

47.     There were other early warnings that the MP D&Os ignored. Stacy Spikes ("**Spikes**"), MP's co-founder and former CEO, had forewarned the MP D&Os that their pricing model for an unlimited movie plan was unsustainable on all but a very short-term promotional basis. Also, in January 2018, Sanjay Puri, Chief Strategy Officer sent MP executives a Wired article in which AMC said that MP's faulty plan was "unsustainable and only sets up consumers for ultimate disappointment down the road if or when the product can no longer be fulfilled." Other publications reported that in 2017, AMC tried "to determine whether it may be feasible to opt out and not participate in this shaky and unsustainable program."

48.     Despite these concerns, the MP D&Os failed to address the issue, and other members of MP's management team struggled to deal with the losing "strategy." In February 2018, Srinivas worried about a Maxim Group equity research report in which Maxim concluded MP would spend $500 million on tickets in 2018. Srinivas was even more bearish, saying, "I think we will be closer to $1.0-$1.1b at current trajectory." Srinivas was also concerned with Maxim's estimate of "losses of $120m in 2018," and commented, "I think will be much higher." He warned Lowe, Farnsworth and Benson, "we need to be careful here? I don't have a good answer how to guide here." But the MP Officers and the HM Officers were not careful, and no guidance could be offered to support their nonsensical plan.

49.     Throughout the first quarter of 2018, Srinivas, along with Mike Berkley, Chief Product Officer, and Puri, both of whom worked closely with Lowe, Benson and Farnsworth and kept them informed of all concerns, continued to worry about losses created by the super users. Berkley explained that any plan to eventually increase the subscription fee could not bring MP to profitability as long as users were utilizing their unlimited plans, explaining that "usage declines are MORE important than price increases. A unit decline can save $100+ on a user - while price

increase only increases by $3-5." These officers collectively decided "[t]he goal here is to reduce the % of heavy users as much as possible."

50.      Any alternative plan the MP Officers and HM Officers implemented were quickly abandoned for fear of reducing subscriber numbers. This lack of direction became a bad joke on social media. Kelly, Chairman of MP's BOD, explained in an email to Lowe in February 2018, "I don't think it's in MoviePass's interest to further the consumer whipsaw meme that has developed in social media (though I do think that robust well-planned testing of various options is critical)." He added that the "backlash" was a "real danger" to partnerships MP needed to survive.

51.      Another plan temporarily adopted in April 2018 to limit subscribers to three movies a month was quickly abandoned, and the unlimited plan was reinstated at the end of the month. In an email at the end of April, Itum complained about the chaotic nature of MP's business planning and said that important decisions should be discussed in person and not in random emails. He said: "We flip like a yoyo and it's not a way to run a business."

52.      In late June 2018, using financial metrics, Srinivas attempted once again to get Farnsworth and Benson to face reality. Based on his detailed mathematical analysis, Srinivas explained that MP would need to reduce its subscribers' use of the MP card to 1.25 movies per month to make MP's business viable while keeping the low per month price for an unlimited plan. Based on subscribers' actual use, he asked "how IN THE WORLD do we expect to AVERGAE 1.25? -nobody can go to negative movies, the lower bound is 0. Do we expect 50%+ of our users to NOT go to the movies?!? -literally that is the kind of distribution we need to get to 1.25." He added "Politely speaking, I don't think we collectiv [sic] realize how difficult (absurd?) it is to achieve 1.25 usage."

## The D&Os Engage in Desperate Measures to Stop Super Users and Stem Losses

53.     In February 2018, certain MP officers were worried about mounting losses caused by the super users, and they sought to improperly shut down subscribers' use of the card to solve their problems. They focused on halting legitimate usage by certain customers, rather than halting the dissipation of assets on a failed business by simply shutting MP down or radically altering its business.

54.     One approach was to "gray out" certain popular titles to reduce viewer activity, despite subscribers' reasonable expectation that those titles would be available. Lowe, worried about how much MP was spending, said: "This is why we need for this coming weekend to gray out Titles or theaters to save money." Concerned about the optics of this strategy, Itum commented, "we have to figure out a way to make this work for and not against us (with both consumers and investors)." Itum was worried about consumers and investors knowing that MP was "hemorrhaging cash." Lowe responded with his gray out strategy: "The scenario im looking for is[,] A- for big Disney titles or other non partner titles this would only affect subs who over last 30 days saw more than 6 movies[,]  B- we find small titles from non partners to block for all at Amc".

55.     In April 2018, under the guise of preventing subscriber abuse, Lowe and certain other D&Os hatched another plan to reduce the number of movies viewed by its subscribers. Again, their focus was on reducing usage by certain customers, rather than reducing asset dissipation from a failed business, which could have been accomplished by shutting MP down or radically altering its business. Lowe and Farnsworth wrote and circulated internally a draft letter that would tell a user that the user's account had been flagged for suspicious activity or potential fraud and that the user would be required to change to a new password. Lowe disclosed that even

though the letter stated that it was being sent because of "suspicious activity or potential fraud," his intent was to simply send it "to [the] top 12% [of] users," the "super users." Berkley stated the obvious problem–that MP "wouldn't be targeting only suspected offenders; we would be targeting all of our heavy users, the majority of whom are in compliance." Berkley and others also predicted (correctly) that doing so would be a public relations nightmare and that such an action would likely draw scrutiny from the FTC or other government regulators.

56.     But Lowe was not deterred from implementing what was dubbed "Project 2%." Within hours of circulating the draft letter, Lowe and the others agreed to forego any warning to users and automatically bump out the top 45,000 users the next morning. On the morning of April 13, 2018, the number was increased, at Lowe's request, to the top 75,000 users. That morning, MP also extended its "ticket verification" requirements to 120,000 additional accounts, a 400% increase. Ticket verification required users to upload a photo of the movie ticket to prove that they had purchased a ticket to the movie they selected. Increased ticket verification also targeted MP's heaviest users.

57.     On April 13th, 3.5% of users were subjected to "password disruption" and 7% were subject to ticket verification. As Itum joked, "Project 2%" had become project 7% and then 11%. MP's analysis in the ensuing days revealed that MP had saved approximately $725,000 over the weekend "entirely as a result of … password disruption and ticket verification." Many subscribers also did not timely reset their passwords for a week or more, and subscribers who did not quickly reset their passwords had their reset links expire. Berkley warned Lowe that that the MP officers could not continue these tactics because eventually subscribers would find out, and the repercussions would be serious.

58.     In the ensuing weeks and months, the D&Os, especially Lowe, came up with other tactics to target the super users. With the Avengers release coming the week after the password disruption, certain D&Os again set to work trying to "throttle" their heaviest users while the other D&Os wholly abrogated their duties. The D&Os who acted to throttle users made it clear that they were not targeting their heaviest users to prevent fraud—they were targeting them because their business model had failed. MP determined that the top 0.6% of subscribers were costing them $2 million per month (or $25 million per year). But since these users were not doing anything wrong by using the service as advertised, MP could not just kick them out. Instead, certain D&Os implemented measures to try to make it appear as if the users violated the terms and conditions of service as an excuse to terminate them. As Berkley explained in an April 19, 2018 email to Lowe, Farnsworth, and others: "We can't legally cancel user's memberships simply because they are heavy users of an *unlimited* plan; they need to be in violation of our terms." (emphasis is original). In essence, the term "fraud prevention" had become synonymous with "prevent heavy use." This was illustrated in an April 27, 2018 email in which Lowe felt that on a day where subscribers purchased $2 million in tickets, it was critical that MP roll out new "fraud prevention measures."

59.     In the summer of 2018, in the face of a severe cash crunch, certain MP D&Os implemented another improper tactic to slow subscribers' use of the card. MP used a daily "trip wire" mechanism, whereby MP automatically cut off all movie access once it reached a predetermined amount of ticket spend. In many instances, the trip wire was triggered early in the day, preventing subscribers from seeing any movies the rest of the day. Sometimes MP would haphazardly turn specific movie theaters and screenings on and off to try to prevent hitting the trip wire early in the day. In one instance, Puri informed others via Slack that he had been drinking and joked: "Let's play game with the subs now you see the movie now you don't."

60.    Before long, subscribers suspected that certain of the MP D&Os were engaging in wrongful behavior, and they became enraged. The "unlimited" service MP offered had become severely limited and subscribers publicly aired their grievances. In contrast to the "any movie, any theater, any day" promise that had vastly increased MP's subscriber base, users now claimed that they could rarely use the service to see their desired movies at their selected theaters when they wanted to. As one MP employee stated in May 2018 to a PR firm MP had hired, "subscription numbers are showing that as people fear for our survival and are hesitating to subscribe or refer friends and our own customers are worried. Social media is a cesspool, we can't post anything on Twitter without getting angry emails from investors." The public blowback harmed MP's reputation and led many subscribers to demand refunds, cancel, or decline to renew their subscriptions.

### The Pricing Catastrophe Could Not Be Fixed

61.    The fact that subscribers were using the card on average more than once a month was more than apparent from MP's losses. With millions of subscribers using its service, MP's net operating losses for the first quarter of 2018 were $100,339,894—over $32 million in January, over $28 million in February, and over $39 million in March. Based on only slightly increased subscriber numbers, MP's net operating losses for the second quarter were $118,162,714: over $42 million in April, over $30 million in May and over $45 million in June.

62.    Most of these losses were attributable to MP paying full price for tickets but receiving only a fraction of those amounts in revenue from its subscription plans.

    a.  In January, MP received $12,081,601 in ticket/plan revenue, primarily from its unlimited and annual plans and from a small amount of gift cards, and it paid $40,732,555 for those tickets (does not include hosting, credit card costs *etc*.).

    b.  In February, MP received $16,063,391 in ticket/plan revenue and paid $40,149,214 for tickets.

   c.   In March, MP received $ 19,017,454 in ticket/plan and spent $52,312,861 for tickets.

   d.   In April, MP received $21,819,591 in ticket/plan revenue and spent $59,881,462 for tickets.

   e.   In May, MP received $23,483,944 in ticket/plan revenue and spent $46,948,342 for tickets.

   f.   In June, MP received $27,081,676 in ticket/plan revenue and spent $65,631,489 for tickets.

63.   MP's dismal results were not apparent from HM's public filings. In May 2018, Avelina Kauffman from NMN Advisors, an investor relations advisor, told Brian O'Connor at Canaccord that brokers were angry, threatening to sue and did not think HM/MP's business was viable. She said she had tried to figure out if HM/MP's business was sound but could not, explaining "[t]he problem is when we looked at the finances in the 10-K, we can't find that because it isn't your typical financial statements and they don't allow for us to substantiate it."

64.   Through endless emails and reports, Benson, Lowe and Farnsworth were fully aware that MP's ticket spend drastically exceeded its revenue. In April 2018, Benson and Farnsworth, with Lowe's knowledge, decided to cause MP to alter cash and loss forecasts to justify MP's unworkable model. On April 2, 2018, Benson forecasted that MP's "cash burn cume" (total amounts of projected cash losses) from May 2018 through March 2019 would be $576 million based on 4 million projected subscribers. Benson then reported that Farnsworth asked Benson, Lowe and Puri to "revisit" the model's projections, especially data and studio deal revenue. Benson also explained: "Ted felt our neg cash for 2018 was closer to $40M - $50M NOT $116M (see Q4 2018)."

65.   Hours later, Benson changed the forecasted "cash burn cume" (based on 4 million subscribers) for May 2018 through March 2019 to $235,099,537, making approximately *$340 million* of forecasted cash burn simply disappear in a matter of hours. This change was made even though losses exceeded $100 million for the first quarter and $210 million for the first half of 2018

(based on about 3 million subscribers). A change in projected revenue of this magnitude (relating to MP's value and performance) should have caught the eye of the other MP directors in the context of financing approval or otherwise. But the Derelict HM Directors and the Derelict MP Directors were so uninvolved in MP's business and they asked so few questions (even basic ones), that a revenue swing of $340 million simply went unnoticed. At late February and March 2018 board meetings, the Derelict MP Directors never discussed losses, financial performance or projections of MP, much less how they compared to comparable companies. Instead, they primarily discussed acquiring a higher percentage of MP stock and obtaining additional funds while ignoring how those funds were used, and they waited months before holding further board meetings. HM board meetings during that time period similarly focused on raising money, making acquisitions and Farnsworth's bonus. The Derelict HM Directors paid no attention to the performance of their primary asset, MP.

66.     In May of 2018, MP directors still failed to consider the problems at MP and the needed remedies to assure that MP was operationally and financially viable. At that time, Kelly proposed a business venture with Facebook (Kelly was the former Chief Privacy Officer and First General Counsel of Facebook) involving "frictionless ticket redemption (ie, frictionless usage)." Mike Berkley replied that it was "counter to [his] primary goal" of "getting [MP] a clear path to *breakeven*, which required significantly reducing usage across the board." That same month, Stipp said to Lowe that she had "been reading some commentary in the press about the financial health of MoviePass and curious how its going? Hoping they are painting a picture that isn't the real case." Rather than insisting on a report from Lowe as to what the "real case" was or voicing concern over the lack of material information, Stipp remained "flexible for in person meetings" and told him "I also sent some beer your way!"

67.     The Derelict HM Directors were even less involved, and never inquired about MP's performance or about the critical issues it was facing. Singh's solution was that "Current Challenges will be overcome by the grace of God asap. Im with you Ted." Gadiyaram focused on how to spin the MP story "[o]therwise what will stick out is 150Mn loss reported."

68.     In July 2018, reality came crashing down. MP's credit card processor, Worldpay/Vantiv (which issued cards to subscribers and provided the funding for the card every time a subscriber used the card to purchase a ticket), cut off service when MP failed to make a $5 million payment because it had run out of money. Desperate for capital and recklessly continuing the failed business, the D&Os negotiated two pricey financings for HM: one on July 13, 2018, in the principal amount of $6,806,850, which included $5 million in cash borrowed by HM from the holder of the Investor Notes and $1,806,850 that HM was required to pay to the holder of the Investor Notes; and another loan on July 27, 2018, from Hudson Bay Master Fund Ltd, a holder of Investor Notes, in the principal amount of $6.2 million which included $5 million in cash borrowed and $1.2 million in original issue discount. Cash raised from these financings allowed MP to continue their exercise in futility.

69.     Starting in August 2018, Farnsworth, Benson, and Lowe again implemented a series of alternative pricing changes, but they were confused, clumsily executed, and far too late in the game to make any difference. The MP D&Os considered surge pricing, which Srinivas thought was a good idea, but others thought was inconsistent with the model. One employee, Adam Lampell, suggested that the executives "lock themselves in a room for 8 hours and emerge with *the least worst option* in terms of how to dig ourselves out of the mess." Two different attempted capped plans were a disaster for MP. The result was reported in an email from Krishnan: "Looks like the cancel requests on a day-to-day basis is swelling while the signups have dropped

drastically. Any thoughts on how to address the situation?" Steve Carr, Head of Data at HM, told Farnsworth, Srinivas, and Osumi that MP's pricing model was a failure and that MP had taken too long to fix it. "The numbers don't lie. We have given MP bus[iness] dev[elopment] ample opportunity to figure this out and they continually come up with too little too late."

70.     The reality was that there was no way to fix MP's business. It had failed long before. The D&Os recklessly carried on with the dissipation of assets and destruction of value in the face of red flags that constantly alerted them to the fact that it was a failed business.

71.     And HM could no longer raise the funds to bail MP out of its problems. Gadiyaram explained that the fundraising situation at that point was "very expensive" and "very difficult," and MP's options were limited. As described by the Wall Street Journal on August 6, 2018: "Short on cash, battered by investors and pronounced dead by critics," MP adopted changes after a "tumultuous several weeks" in which MP "stopped working in most theaters and [HM] had to borrow money at a high interest rate to stay afloat." Lowe himself admitted that MP was getting nowhere and was "whipsawing people back and forth."

72.     By mid-September 2018, Srinivas reiterated to Farnsworth, Lowe and Krishnan that their desperate late-in-the-game plans were not working but Farnsworth and others were again pushing to revert back to an unlimited ("un-feathered") plan. The fact that heavy users were a problem that could not be fixed was not a surprise. MP employees had foreseen this earlier and it was crystal clear to the MP D&Os by April 2018. In August 2018, Srinivas forwarded the November 2017 Srinivas Email to Osumi, Chief of Staff to Farnsworth. Srinivas highlighted the worry he had articulated since *late 2017* but that the MP D&Os had failed to address—that the heavy users would "kill" MP. Osumi responded "Holy Sh*t. You were right."

73.     Two later plans in December 2018 and March 2019 (a return to the unlimited plan) were half-hearted attempts to fix a hopelessly broken model. At that point MP was a shadow of its former self.

74.     The events referred to in this section "The MP Pricing Plan Did Not Work" are referred to herein as the "**Reckless Pricing Model**."

## B.  D&Os Knew Critical Deals with the Big Three Were Impossible

75.     When MP repriced its service in August 2017, the MP D&Os announced that movies would be "available in 91% of theaters in the U.S.," including AMC Entertainment Holdings ("**AMC**"), Regal Cinemas ("**Regal**"), and Cinemark USA, Inc. ("**Cinemark**", collectively the "**Big Three**"). MP wanted to make its service available at the Big Three to show these exhibitors that MP had millions of subscribers, many of whom were using their theaters. MP assumed that once they showed their clout, the Big Three would be forced to do deals with MP for discounted ticket prices and/or a share in concession revenue. This was a critical component of MP's plan. According to a Goldman Sachs equity research report of February 9, 2018, MoviePass assumed, baselessly, that it could negotiate a revenue share of $2-$3 per movie ticket and 20% of concessions. Without these deals, MP was not viable since the Big Three dominated with over a 50% market share.

76.     But the Big Three were not interested in any deal with MP. According to the same February 2018 Goldman Sachs report, AMC said on a third-quarter 2017 earnings call that it had no intention of sharing any of its admission or concession revenue with MP. As Mike Berkley explained, the movie theaters' margins on tickets were razor thin, and they made their money on popcorn and soda. The D&Os were undeterred and assumed, despite all evidence to the contrary and without any realistic analysis, that once MP had millions of subscribers, the Big Three would be forced to deal with them.

77.     In April 2018, MP had millions of subscribers, yet they had not even come close to getting any deals done with the Big Three. The red flags were sending a clear message. No deals would ever get done. One article published at that time commented: "But who the heck is Mitch Lowe, other than AMC Theaters' Public Enemy No. 1 (seriously, AMC really, really hates MoviePass)? Where did he come from?" MP had no better prospects with Regal or Cinemark. While MP D&Os claimed they would "disrupt" the industry, without the Big Three, they had no business capable of disrupting anything.

78.     MP had also hoped to do deals directly with movie studios (that produced the movies) to earn revenue from promoting their movies. MP confirmed through MP's interaction with the studios that the Big Three detested MP and if a studio did deals with the Big Three, the Big Three would hold that against that studio. In May 2018, Zac Bright, Director of Business Development at MP, had a meeting with Amazon Studios to discuss a possible deal. The answer to MP was simple. We cannot do business with you because if we do, the Big Three will not work with us. Bright said Amazon warned of the "serious **red flags** about the optics of working with MP and potential ramifications [the Amazon] team will face by openly collaborating with [MP]." Bright added, "My contact at Amazon specifically used the word 'toxic' to describe the Distribution Team's account of what the buyers at the major 3" think of MP.

79.     Bright made clear the financial impact this would have on MP:

> It's **VERY** apparent that what we are working toward on the Studio/Distributor side of the business is directly tied to Exhibition, and **will not be scalable** unless we get at least 1 of the major 3 exhibitors to do a deal with us, or, at the very least, get one of them to go on the record as being pro-MoviePass.

80.     Another MP employee, Allison Mellon, Senior Vice President of Studio relations, said: "The common theme at *every* meeting and call is that the big three exhibitors ***do not want the studios working with MoviePass*** and we know that one, even threatens studios about working

27

with us. If we can just get one of the three to ***acknowledge*** us- everything else will fall inline"

(emphasis added). At this point, while the D&Os touted a business model that was based on deals

with the Big Three, the Big Three would not even "acknowledge" MP. Itum forwarded the email

to Farnsworth and Lowe and said: "re: big three, gentlemen, I am getting this from all sides."

81.     Itum also shared the Amazon Studios email with Lowe and Farnsworth. Lowe shut

him down and responded: "Nothing new here Khalid. They want us not to exist." Rather than

facing reality, Lowe suggested that MP should get *even bigger* (which would cause MP to suffer

even more insurmountable losses). By June 2018, MP's disastrous approach only further alienated

their desired partners. Itum said the Big Three were angry at MP and that MP was being referred

to as a "cancer" in the industry.

82.     Kelly and Stipp failed to put any processes in place to assure they were informed

of developments with the Big Three. Kelly had been involved with MP for years and knew how

critical a deal with one of the Big Three was for MP. Stipp, who received information regarding

another exhibitor deal, also knew that MP's operational and financial viability relied on the Big

Three. Despite these facts, Kelly and Stipp failed to assure that the Big Three were willing to work

with MP, or to ascertain how MP intended to force the Big Three into doing deals with MP if the

Big Three flatly refused.

83.     The Big Three were also creating their own subscription plans to compete with MP.

Cinemark introduced its Cinemark Movie Club service in late 2017, and AMC launched AMC

Stubs A-List in mid-2018. Lowe and Farnsworth were well aware of these plans, since they were

widely known in the business and publicly announced. Zac Bright also reported on other movie

plans to Kelly. Berkley noted that the Big Three were attracting subscribers with their new

programs. The Big Three, however, were happy to leave the heavy users to MP: Cinemark CEO

Mark Zoradi said in March 2018 that MP was good for the serial moviegoer—the movie goers from whom it was hard (or, as MP knew, impossible) to make money.

84.     These exhibitor programs also offered some added benefits that MP could not offer, such as discounts on concessions. AMC's Stubs A List offered "advanced booking, e-ticketing, repeat viewings, and premium formats, all superior features to those offered by MoviePass." Berkley also noted that Big Three could run the programs more profitably. He explained that AMC's cost of goods was much lower than MPs, and therefore AMC could offer better pricing. AMC also had a lot of marketing money they could throw at this new service, and a greater ability to absorb losses. In July 2018, Krishnan put it simply: "Big chains like AMC are willing to give a discounted price for Costco while they are not willing to make a deal with Moviepass."

85.     On August 1, 2018, Srinivas informed Krishnan that on an AMC earnings call, AMC made clear that MP had become irrelevant to AMC and Wall Street: "there was very little MP discussion in the Q&A too (vs. previous calls) - WS [Wall Street] just doesn't think we matter at all." And MP could not get material deals with any other significant movie theater chains either, such as Harkins Theaters or Cineplex Entertainment. While MP had a handful of insignificant exhibitor deals with boutique theaters, even those deals were bungled due to the MP D&Os' mistakes, and any small benefit received did not even put a dent in the MP's mounting losses. Without the Big Three, the D&Os knew MP was simply dead in the water.

86.     The events in this section "D&Os Knew Critical Deals with the Big Three Were Impossible" are referred to herein as the "**Big Three Failure**."

**C.** **Neither MP Nor HM Had Revenue-Producing Data Analytics and the D&Os failed to Cause MP and HM to Develop Them**

87.     A key part of MP's purported business plan, and one of the primary reasons that the HM D&Os claimed they caused HM to make the over $187 million in Reckless MP Transfers,

was that MP could generate revenue from licensing its data. But MP's claim was a farce because the D&Os had no plan to monetize data, largely because HM and MP lacked the capabilities to implement one.

88.     In August 2017, Farnsworth touted the technological synergies that would be created by HM's acquisition of MP. In a press release, he explained that "the technology platforms that Helios and Matheson have built over the years are a perfect fit for the MoviePass family. With our big data, as well as our artificial intelligence platforms and other technologies that we own, we will be able to bring an unparalleled technological advantage to MoviePass." In an article published in *Fortune* magazine at that time, Farnsworth explained that MP's goal was to amass a large base of customers and collect data on viewing behaviors to target ads to subscribers. When HM increased its stake in MP in October 2017, Farnsworth publicly said that "HMNY and MoviePass can offer important analytics to movie studios and exhibitors" by applying "computer science and machine learning."

89.     Despite HM representing itself as a "big data" company, the reality was that HM had no data analytics capabilities that were relevant to MP or that could be converted into relevant technology. Zone Technologies, Farnsworth's prior venture that merged with HM in late 2016, produced an application called RedZone Map that mapped local crime data. But Zone's mapping technology was licensed, not proprietary, and had no relevance to MP. While HM had some relationships with people and companies in India that either licensed these capabilities to HM or agreed to develop these capabilities for RedZone Map, no deals never came to pass. As Srinivas later described it, HM had "woefully ignored and under-invested in" data collection.

90.     Undeterred by its shortcomings, MP sought to market its data capabilities. In late 2017, through Itum, MP began discussions with Fox Film Corporation ("**Fox**") on one of the only

MP studio deals. Itum reported back to Lowe and Farnsworth that Fox's top priority was data. Itum was concerned since data was not MP's "strong suit" and there was "an inherent tension in what they want and what we have." MP later struggled with the simple task of verifying the number of tickets sold by MP as part of an advertising campaign for Fox's title Maze Runner 3. That fiasco, together with an unauthorized test advertising campaign, made Fox swiftly cut ties to MP. As Itum explained: "as a team we're not on the same page about what data we are currently collecting and gathering, what data we could be collecting, and how we might partner with the studios on it."

91.    Worse yet was MP's first deal to license its data. In early January 2018, for a percentage of advertising revenue, MP agreed to provide information about its subscribers to iHeart Media ("**iHeart**") which it would use to send targeted advertisements. When iHeart made its first request for data in March, the MP D&Os were unsure of how to fulfill it. As Puri explained: "MoviePass is not really monetizing the data today. . . . there is no accurate information on specific users (ex: John Doe) and specific movie habits." The MP D&Os also knew the iHeart deal likely violated MP's privacy policy and that it might catch the FTC's attention.

92.    Lowe made the issues even worse by publicly pretending MP was a leader in data collection even though he was clueless about data. On March 2, 2018, at the Entertainment Finance Forum in Los Angeles, Lowe gave a keynote speech entitled, "Data is the New Oil: How Will MoviePass Monetize It?" Lowe preached:

> [B]ecause you are being tracked in your GPS by the phone [through the MP app] .
> . . we watch how you drive from home to the movies. We watch where you go
> afterwards, and so we know the movies you watch. We know all about you. We
> don't sell that data. What we do is we use that data to market film.

93.    Lowe's statements, clearly designed to make MP seem like a sophisticated player in user data (when in fact it was not), could not have backfired more. The statements caused a media firestorm about privacy violations, especially because the tracking Lowe described would

have flagrantly violated MP's own privacy policy. This forced Lowe to publicly backtrack and clarify that MP did not in fact track its users through their GPS other than at the instant they checked in to see a movie. Worse, Lowe's misstatements triggered an FTC investigation into MP for privacy violations. Schramm, who paid little attention to MP and rarely asked questions about transactions or other events he was obligated to monitor, reached out to Lowe about this event. Oddly, rather than inquiring about this disturbing issue, he expressed sympathy. "Whatever it is that you said about MP's capabilities seems like small ball by comparison. Let's hope this blows over soon." The other Derelict MP Directors, including Kelly, Facebook's former Chief Privacy Officer and First General Counsel, simply failed to address these known issues. Kelly made no effort to assure data was properly gathered and made usable, despite the fact that Kelly had extensive experience with data-use issues. Kelly also knew that the data's monetization was integrally connected to MP's financial viability.

94.     Notwithstanding their data-related incompetence, certain D&Os, especially Farnsworth and Lowe, projected grossly unrealistic data-related revenues in a very short timeframe and the other D&Os were derelict in failing to engage on this important issue in a sufficient manner to avoid making reckless decisions based on phony assumptions. On a conference call with investors hosted by Goldman Sachs on February 9, 2018, Farnsworth and Lowe baselessly projected that MP would develop $5-$6 of revenue per subscriber per month from data-driven projects including studio marketing, advertising, and other sales. In February and March 2018, Lowe received financial projections from Puri and Srinivas. The financial model projected data licensing revenues at $16 million in 2018, growing to $40 million by 2021. Studio revenues from advertising deals were projected to be $5.7 in 2018 million and rising to about $40 million by 2021. Despite this already unrealistic and rosy view of MP's revenues, Lowe did not like the

projections and instructed Puri and Srinivas to hype up MP's financial model even more to hit certain EBITDA targets.

95.     Per Lowe's direct instruction, the new financial model projected dramatically lower losses, based on Srinivas and Puri "ramping up other revenues meaningfully." Those "other revenues" were primarily studio revenue and data licensing. This new and improved model, which was presented to a leading entertainment agency, William Morris Endeavor ("**WME**") on February 26, 2018, was laughable: it projected that MP would make $125-$130 million from *each* of data licensing and studio revenue in 2019, rising to $220 million from studio revenue and ***$524 million*** from data licensing in 2021. Srinivas aptly characterized those projections as "outrageous" when considering that MP was projecting $37 per user whereas large companies with millions of users (CoreLogic and Fair Isaac) made less than one dollar per user from data licensing. Srinivas and Puri also resisted Lowe's desire to compare MP to Twitter, which made $333 million in data licensing revenues in 2017 (far less than the $524 million in data licensing revenue MP projected for 2021). Srinivas later stated the obvious to Lowe and Puri: "My personal opinion is our numbers are TOO HIGH." The Derelict MP Directors never inquired about MP's plan to use data or how it could possibly be achieved. Kelly, who was supposed to have an extensive background in data, failed to ask even basic questions about MP's data revenue or overall plan, and/or its impact on BOD decisions. Kelly received the models and forecasts that were sent to WME, but never questioned or voiced concerns regarding the absurd projections. While he tried to introduce MP to data partners, Kelly never tended to the foundational problem—that no partner would deal with MP because any data it had was in disarray and unusable. Stipp was also aware of the WME presentation.

96.     Even when presented with simple opportunities to profit from its data, MP was incapable of doing so because the D&Os failed to cause MP to collect useful data in the first place. In April 2018, advertising client Laurel Road asked MP to target its subscribers based on age, income, and education level. Srinivas explained in an internal email, "we probably have 500k+ users in this pool – but we have no idea who is who" because "Mitch [Lowe] and others have pushed against" collecting demographic information from subscribers at sign up to avoid "'inconvenienc[ing]' the users." It was not until April 30, 2018 that MP finally hired a Chief Data Officer, Ed Vincent, who noticed immediately that MP did not have monetizable data about its users. In May and summer of 2018, Vincent pointed out to Lowe that because MP had failed to hire a third-party company that could append MP's data onto MP subscriber profiles, there was no way to monetize the data. Not understanding how to protect MP's data so that it could be monetized, Itum asked if MP should enter into a deal with a company called LiveRamp. Vincent explained "This is not a good idea. Let's talk. Once in LiveRamp everyone will have MP data." Recognizing that MP knew little and had done little before Vincent's arrival Itum joked "That's exactly why you're here, haha."

97.     It was not until the summer of 2018 that MP figured out how to perform a small data deal with iHeart, but it was far too little and far too late. MP hired a third party to anonymize MP's data that would be sent to iHeart and MP changed its privacy policy so that iHeart could target MP's subscribers with advertisements. But MP did not receive iHeart revenues until November 2018, and the deal only raised a few hundred thousand dollars for MP (which was likely netted out to zero in terms of the overall benefit of the iHeart deal). This was a far cry from the hundreds of millions projected. In the fall of 2018, after the D&Os had a full year to figure out how to monetize MP's data, Itum still described MP's data analytics as a "blindspot." By then,

34

HM had wasted over $187 million to support the failed MP business plan and HM was insolvent or nearly insolvent. MP's data play would never happen—a fact that was or should have been obvious to the D&Os long before they recklessly dissipated many tens of millions of dollars of HM's and MP's cash.

98.     The events in this section "Neither MP Nor HM Had Revenue Producing Data Analytics and the D&Os failed to Cause MP and HM to Develop Them" are referred to herein as the "**Data Analytics Misconduct**."

**IV.     RATHER THAN ADDRESS PROBLEMS, THE PRIMARY HM AND MP DIRECTORS USED HM AND MP FOR THEIR OWN BENEFIT: DERELICT HM AND MP DIRECTORS DID NOTHING TO STOP THE CONDUCT**

**A.   The D&Os Engage in and/or Permit Unfair Insider Deals That Harmed HM**

99.     During 2018 and 2019, Gariyaram and Farnsworth engaged in self-dealing and put their own interests above those of HM and MP.

100.    Gariyaram's company HMIT, an HM owner, was being accused of fraud in India. Gariyaram was also personally being accused of wrongdoing. Krishan's company Maruthi Consulting, an HMIT subsidiary, was also implicated in the alleged fraudulent scheme.

In early 2018, Gadiyaram told Farnsworth and others that he needed compensation from HM to solve HMIT's problems. He said "[w]ith difficulty HMIT managed to buy 60 days' time from the Madras High Court [in India]. The HMIT Board expects me to come up with $ 3 Mn before the extended dates expires. My attempts to have this issue addressed earlier have not been met with

success." [2] In March 2018, Gadiyaram retained legal counsel for HMIT and requested that HM pay HMIT's legal fees and HM obliged.

101.    HM also funneled cash to Gadiyaram through a sham "consulting" agreement. In October 2017, HM entered a purported consulting agreement with Gadiyaram whereby he was paid to report to Farnsworth and "provid[e] guidance to [HM] and Zone relating to the further development of their respective businesses and technologies . . . including, without limitation, MoviePass Inc." Gadiyaram was to "determine the method, details and means" of performance. From October 2017 until April 2019, Gadiyaram received $507,561.66 pursuant to this "agreement." HM data was never developed, and Gadiyaram provided no other material value to HM, MP or Zone.

102.    Farnsworth also engaged in self-dealing transactions. In the spring of 2018, while MP was struggling to control losses, and as the D&Os were preparing to reset passwords and engaging in other tactics to prevent heavy users from using the service, Farnsworth orchestrated his receipt of a $1.5 million cash bonus from HM. A reporter from TheStreet pointed out the obvious: "The company is hemorrhaging cash, yet it pays out a $1.5M in bonus IN CASH." Despite a myriad of bad behavior that harmed MP and destroyed its potential business, the compensation committee, led by Schramm, with Ralbag and Singh as the other members,

---

[2] In January 2016, the High Court of Madras ordered that HMIT be liquidated, and the Court asked the Ministry of Corporate Affairs to direct the Serious Fraud Investigating Office to inquire into HMIT's affairs. The Madras court then issued a stay of the liquidation so HMIT could try to work things out with its creditors. On March 23, 2018, the State Bank of India ("**SBI**") filed a First Information Report against HMIT, Gadiyaram, and other officers of HMIT. It said that term loans obtained from SBI were diverted to HMIT's U.S. subsidiary, Maruthi Consulting Inc.—Mr. Krishnan's company—after providing fake documents to suggest that the money was to go to another subsidiary.

determined that Farnsworth deserved the bonus because he had completed capital raises (in part to accomplish the Reckless MP Transfers) and had worked "successfully with MoviePass management to develop and expand the MoviePass business." The compensation committee attempted to hide behind a report by an independent consultant that assumed that MP was a "revolutionary business in the cinema industry" and that it was performing well, even though MP was an utter catastrophe. At the time the bonus was being made, the red flags were mounting.

103.    In addition to paying Farnsworth's salary and an excessive bonus, the HM D&Os caused HM to pay the rent on Farnsworth's Manhattan apartment, car allowance, unjustified costs for large and luxurious private jets and payments to his yacht company, Day Dreamer Yacht Company, with no thought as to whether these expenditures were for the benefit of (or even related to) the business. Worse yet, the Derelict HM Directors did nothing to stop this abuse.

104.    The events in this section "The D&Os Engage in and/or Permit Unfair Insider Deals that Harmed HM" are referred to herein as the "**Insider Deal Misdeeds**."

**B.  The D&Os Engage in and/or Permit Lavish and Uncontrolled Expenses as They Drained MP of Resources**

105.    Despite HM's and MP's precarious finances, the D&Os allowed executives to live lavish lifestyles on HM's and MP's dime with no corresponding or proportionate business purpose.

106.    Farnsworth was known by those in charge of MP's and HM's finances, including Benson, as a reckless spender, and he used HM's resources for a host of unreasonable and unmerited perks. In October 2017, Benson noted in an email that Farnsworth's comingling of business and large personal expenses would "cause us to be written up for lack of internal controls." At one point, Karina Kolesnyk, who handled credit card expenses at HM, told Jeannie Lasek, HM's and MP's Director of Human Resources, that if she saw Farnsworth's credit card expenses, she would "probably faint."

107.    Farnsworth also fostered an environment in which executives expensed anything they desired to MP or HM without any oversight. Farnsworth would simply approve employees' expenses, often without even reviewing them. As Lasek put it in June 2018, "linda [Farnsworth's assistant] just slaps on [Farnsworth's] approval and doesn't actually review receipts and line items …. [Linda] will say [Farnsworth] approved – but [Farnsworth] does not even review." In late 2018, Lasek observed that if HM's auditors would test expense controls, they would learn that "employee expenses are like 500% more in 2017/2018 then they were in 2016" (before HM purchased MP).

108.    For example, the D&Os spent outlandish amounts of HM's and MP's money on festivals that had no business purpose other than to allow the D&Os to continue "living the life on the company dime." In April 2018, the MP D&Os spent over $1.5 million on Coachella, including $350,000 paid to Itum's event company, Kaleidoscope, $15,000 on a helicopter, and $25,000 for a Dennis Rodman publicity stunt. The young people attending music festivals were not MP's target customers, and spending vast amounts of money on marketing events was nonsensical at a time when it was internally recognized that the subscriber base "blew up itself by word of mouth and no one [sic] knows what to do with it." The "tone at the top" permitted unfettered spending. As Lasek put it, "they all do whatever they want and they get away with it." In December 2018 when HM and MP were in the zone of insolvency, Itum was so accustomed to having expenses blindly approved that he became outraged when he was questioned about an expense for a consultant to fly business class to Cannes festival.

109.    Farnsworth, the biggest spender of all, funneled money for personal luxuries through MoviePass Films ("**MP Films**"), an entity that was formed in May 2018. HM owned only 51% of MP Films, but provided all of its financing. Even after HM's access to capital had dried up for all but the rare small equity deals in which HM's stock was sold for pennies, Farnsworth

demanded that HM send money to him for "expenses" through MP Films. With the HM D&Os'
approval, Farnsworth demanded HM funnel cash from HM to MP Films to the tune of over $9
million with no material return on that so-called investment. Even in October 2018, when HM was
approaching insolvency, Farnsworth caused HM to transfer substantial sums to MP Films, and HM
continued to funnel money into MP Films into 2019. Damon, who became the new CFO of HM
and MP after Benson resigned in March 2019, asked why HM was transferring this money without
any budget. Farnsworth replied: "Send the full amount of money and that is the order. $350,000
need to be wired tomorrow morning. This is a fucking joke it's easy to get shit done to
Congress!!!!" In March 2019, HM "advanced" (Benson put the word in quotations) almost $50,000
to MP Films for a table at an Oscars event, which Farnsworth attended. In another instance, in
March 2019, at a time when MP Films was not making its payroll or paying payroll taxes,
Farnsworth authorized HM to pay $100,000 of MP Films "expenses" without Benson's approval
and without any procedures. Having participated in misdeeds for over a year, and now acutely
aware of the liability he was facing, Benson demanded to be removed as an officer of MP Films
immediately thereafter. The companies' auditors also threatened to withdraw from auditing HM
because of MP Films's lack of expense controls or procedures.

110.    In November 2018, Farnsworth also wasted precious resources paying for a private
jet for his personal and "business" travel. Farnsworth arranged this through a company called
MoviePass Air, LLC" ("**MP Air**"), of which he was a managing member. At the time, MP Air had
been partially formed but had no operating agreement and no defined owner. In 2019, MP Air
became a subsidiary of MP Films, and Farnsworth caused HM to continue to cover MP Air's costs
without the other HM D&Os doing anything to monitor, control, or halt such payments.

111.    HM transferred significant funds to pay for MP Air's lease of a Gulfstream jet. HM financed the lease between MP Air and JetLease with a $100,000 deposit. In the following months, MP Air incurred hundreds of thousands of dollars in expenses on the lease at Farnsworth's direction, including late fees as HM struggled to keep up with these payments. Farnsworth was also working on hiring three full-time pilots to fly the jet, who would be paid $400,000 in salary, plus $45,000 to pay for their schooling.

112.    In February 2019, Benson and Damon (who later became MP's and HM's CFO) learned of the lease and pilot expense, and Damon commented to Benson, "apparently we are going into the airline business." This timing was critical because, as Benson had belatedly explained, HM was in the zone of insolvency. The next day, Damon received a copy of a lease agreement between MP Air and JetLease for a Gulfstream IV ("Seats 12 with lots of space to walk around") and was told that two pilots already had "handshake agreements," and that the pilot schooling had already been paid. Damon had "many questions" about the arrangement and "no answers." Benson admitted that it was unknown at the time who owned and managed MP Air; what its purpose was; who would do its accounting; whether there were concerns regarding individual and corporate liability; what FAA rules and regulations they needed to consider; and whether potential related party transactions had been addressed. None of these questions were answered and Farnsworth continued to demand that HM pay hundreds of thousands of dollars in airplane expenses with no accountability. Benson blindly complied.

113.    The Derelict HM Directors did nothing to stop the waste created by HM's investment in MP Films. From the start, Singh and the other Derelict Directors had supported the purchase of a percentage of MP Films in May 2018 with little idea of its value to HM. Despite the financial hardships facing HM, HM was to provide all funding for MP Films while its partner

sourced films and invested little. In April 2019, Ralbag was asked to approve Farnsworth's MP Films compensation package of $250,000 (not to mention de facto benefits), even though the HM BOD was unsure whether Ralbag was even on HM's compensation committee. By July of 2019, the Derelict Directors, including Ralbag, Singh and Fried had failed to stop HM from funding almost $200,000 per month in MP Films overhead, and had spent millions funding a variety of movies, including the Escape Plan, an investment made in May 2019. The Derelict Directors also retroactively approved the formation of MP Air in May 2019 without engaging in even a basic analysis of whether it made sense.

114.    The events in this section "The D&Os Engage in and/or Permit Lavish and Uncontrolled Expenses as they Drained MP of Resources" are referred to herein as the "**Uncontrolled Expenses**."

### C. HM and MP Board Members Abrogated their Duties and Failed to Attend to These Issues

115.    While Benson and Lowe engaged in irrational and reckless conduct and Farnsworth and Gadiyaram engaged in reckless conduct and self-dealing, the Derelict MP Directors and Derelict HM Directors paid little attention to the companies they served. Approximately $187 million in Reckless MP Transfers were funneled from HM to MP from mid-April to September 2018 in the form of 91 advances. Yet there were no board discussions of these transfers until late August 2018. In informal, last minute, one-line emails, Benson and other MP officers simply requested and executed multi-million-dollar wire transfers. The Derelict HM Directors knew that tens of millions of dollars were being used for MP as a result of HM's numerous financings; yet, the first limited discussion of MP's business prospects by HM's BOD was in late August 2018 (HM had advanced $155 million between mid-April and August 7, 2018), when HM's access to capital had dried up. Moreover, the Derelict HM Directors did not discuss MP's management, its

business plan or its chances of success, even though MP was HM's primary asset and HM was pouring tens of millions into MP every month. This was evidenced by the patchy drafts of MP board minutes that barely covered the topic of HM's financing MP to the tune of over $187 million. Many of the board minutes of both HM and MP during this critical time were either never approved or approved in bulk (many months after the meetings).

116.    Several of the Derelict HM Directors and Derelict MP Directors complained about the BOD's dysfunction in retrospect, even though they had allowed and participated in the dysfunction. Clearly, they were aware of the problems, but only spoke up as they departed to try to retroactively protect themselves from liability. Schramm, an HM and MP director, was an economist and professor at Syracuse University. He apparently joined HM's and MP's BOD to promote his book "Burn the Business Plan: What Great Entrepreneurs Really Do." Until August 2018, as the HM Officers and MP Officers were "burning" their business down, Schramm rarely questioned any of MP's decisions (other than his stock grant). Upon joining the BOD in January 2018, he wrote to Adam Day at HM "While no one can enter a review on Amazon just yet, and you shouldn't because you are the designer of the cover, can you recruit some people who I don't know, but who could work for HMNY or MP, to rave about the book?   Much appreciate it."  He also "jokingly" asked if MP could make Burn the Business Plan into a movie. While Schramm was very focused on his personal goals, he had a relaxed approach to HM's and MP's business affairs and paid little attention to his responsibilities as a director. In April of 2018, Schramm found out through a press release that HM had purchased Moviefone without board approval. Rather than demanding a change in procedure requiring board approval of critical transactions, Schramm meekly replied, "one suggestion, it *might* be worth thinking about alerting the board to events as

important as these before the fact." (emphasis added). In May 2018, Schramm asked Benson: "Stuart, am I on the audit committee?"

117.    It was not until late July and early August 2018, when MP was in critical condition, and it was obvious to the Derelict MP Directors and Derelict HM Directors that they could be facing personal liability, that these directors began to ask meaningful questions about MP's business. Schramm asked about a solvency analysis, liquidation analysis and bankruptcy plan, and complained that the "board has never seen a strategic plan." He also belatedly complained that board members were required to approve minutes that come "en masse, and were only available long after the meetings they recorded." He then promptly sent a resignation letter saying he had been provided inadequate information and notice regarding decisions and transactions and that there were other process problems at HM and MP.

118.    The other Derelict HM Directors were no better. Singh belatedly complained of a "total lack of reporting" by Benson, saying that "[c]ommunication and information availability from your end has been a big challenge from day one." But Singh did nothing to correct it or assure he received adequate information. Ralbag (who did almost nothing for HM) failed to voice any concern about the lack of oversight over HM. Ralbag sat on the HM BOD from 2016 through the bankruptcy filings, but he never questioned any of the other D&Os' decisions or asked why HM was pouring hundreds of millions of dollars into MP without any board discussion or approval. Several of the few substantive emails he sent or received concern payment of his board fees.

119.    None of this dysfunction was remedied, in part because HM's oversight procedures were severely deficient or nonexistent. Control and oversight deficiencies were memorialized by an audit report for 2017 done by RRBB, an accounting and advisory firm. HM had material weaknesses, including issues with the approval of equity and debt transactions, material errors in

all important accounts, no process to capture and record contracts' effects on the financial statements, and an insufficient accounting department. Despite having an Audit Committee consisting of Singh, Schramm and Ralbag, these material weaknesses were not remedied in 2018 or 2019. In several instances (discussed above), Schramm and Ralbag were not even sure which BOD committees they sat on. In November 2018, Benson belatedly suggested that the audit committee begin to meet every two weeks, but that never occurred.

120.    Fried, who was equally inactive, replaced Schramm on the HM BOD several months after Schramm resigned. Despite HM being in the zone of insolvency, Fried also failed to attend to HM's issues and seemed to act for HM only in name. By 2019, Benson told Fried that a primary goal of the D&Os was "limiting the Company's Officer's and Directors personal liability."

121.    MP's oversight procedures were not even worthy of criticism since they were essentially nonexistent. The MP D&Os failed to put processes in place to assure the operational viability, legal compliance, and financial performance of MP. Despite the untested nature of MP's business endeavor, there were no meetings to present and discuss ongoing losses, updated forecasts, legal issues (until it was too late) and other relevant information and no audit or compensation committee was ever formed. Board meetings were held erratically, mostly so HM could issue more shares so that MP D&Os could get bought out or paid. Most board minutes were left in draft form.

122.    In light of the lack of a reasonable and reliable information and reporting system, the MP's directors should have been even more vigilant about ascertaining that transactions were not reckless.  To the contrary, Stipp signed off on transactions without questions or follow up, ignored well known financial problems at MP and encouraged Itum's idea of making Lagunitas (Stipp was CEO of this company) the beer of choice for millions of MP subscribers without raising

conflict of interest issues. It was only when trouble arose in the summer of 2018 that Stipp belatedly started asking questions. Even then, however, her lax oversight and her inattention led her to encourage Farnsworth's and Lowe's irrationality. On July 31, 2018, after MP's credit card processor fiasco, Stipp dismissed the problem in broad strokes, opining that MP could "continue to disrupt the clunky movie ticketing industry of the past." She continued to authorize nonsensical acts of the MP Officers.

123.    Kelly was aware of the problems at MP as early as March 2018. He had been involved with MP prior to the HM acquisition, knew of the problems with MP's model and was knowledgeable on data-use issues. Yet he failed to cause MP to implement means to assure MP addressed the issues it faced. In October 2018, Kelly resigned because of "insufficient information on the current state of and plans for business." Stipp resigned at the same time with similar concerns. Like Schramm, only once MP was at the end of its rope did Kelly and Stipp object to the way the MP BOD made decisions.

124.    The events in this section "HM and MP Board Members Abrogated their Duties and Failed to Attend to These Issues" are referred to herein as the "**Board Abrogation**."

V.    **AFTER CAUSING HM'S AND MP'S DEMISE, THE D&Os
CONTINUED TO DESTROY THE REMNANT VALUE IN HM AND MP**

A.    **The D&Os Had Caused HM to Cut Off Its Access to Capital and
Creditors Demanded Payment**

125.    By September 2018, as a result of the HM D&Os' continuous process of recklessly burning through cash, HM no longer had access to capital, and HM and MP struggled to stay afloat. The millions of dollars raised by convertible debt and equity offerings that the D&Os recklessly poured into MP had increased HM's total outstanding shares from 7 million in August 2017 to 1.36 billion in September 2018. After having desperately tried to prop up the plummeting stock price through a reverse stock split (in which 250 shares were exchanged for one share) and other

tactics, in July 2018, HM could no longer control the situation. On a single day on July 27, 2018, after credit card processors shut down the MP credit card, HM's stock price dropped from $4.83 to $2.00. After Business Insider published an article on MP shortly thereafter, the price dropped again. In August and September 2018, HM's stock price vacillated between two and three cents a share.

126.   HM's low-priced equity offerings and its convertible note financing had caused NASDAQ inquiries and concerns. Struggling to keep its NASDAQ listing, between October through December 2018, HM was forced to exchange Convertible Notes for Investor Notes and the balance owed to investors was transformed into non-convertible debt.[3]

127.   In December 2018, MP officers argued among themselves and scrambled for non-existent solutions. Itum claimed Benson was changing "the goal posts, without any forewarning," and his "actions [were] jeopardizing the companies' very existence." In another huffy email, Itum suggested "that if we don't reach agreement and receive some authority and the room to maneuver, that you (you: Stuart Benson) lead the operations at MoviePass." Benson replied "Plain and simple if MP cannot be profitable on its own it's a problem and we must wind down the business. You should not be counting on the reserves to keep the business afloat as the days of funding MP is

_____

[3] In October 2018, the June 2018 Investor Notes issued by Hudson Bay in the amount of $68 million were netted against the June 2018 Convertible Notes issued by HM, and Hudson Bay was issued a new non-convertible Senior Note issued by HM in the amount of $20.4 million. In December 2018, the amounts remaining under the June 2018 Convertible Note and June 2018 Investor Note were exchanged. HM issued a new Non-Convertible Note in the amount of approximately $11.3 million to the holders. That same month, the November Convertible Notes (in the amount of 18.8 million) and January Convertible Notes (in the amount of $25.7 million) were netted against November and January Investor Notes. HM issued new Non-Convertible Senior Notes in the amount of approximately $11.3 million.

[sic] over. We are in the zone of insolvency whether you like it or not." These comments and realizations were too little too late, yet they remained unheeded.

128.     In January 2019, Benson again informed the HM D&Os that HM was in the zone of insolvency and did not have enough cash to get it through the month. Benson said MP did not have any path to solvency and the HM D&Os should discuss a wind down of the business. When Itum insisted that spending tens of thousands of dollars at Sundance Film Festival was integral to MP's plan forward, Benson said MP had no cash to pay the Sundance and CinemaCon business development/marketing expenses. Rather than accept that such expenses were inappropriate, Itum said to Benson and Farnsworth that he had improperly "reduced ticket-spend last-minute this weekend by $75K" (i.e., blocked some subscribers' use of the card) so MP could "pull Sundance off." Realizing the result of the D&Os earlier recklessness (including his own), and unable to change things to save the remnants of value in MP, in March 2019, Benson resigned from his positions at HM and MP.

129.     By 2019, it had become extremely difficult for HM to raise even small amounts of money at rock bottom common stock and warrant prices, and creditors, who wanted to get out of the MP credit, demanded payment from these proceeds.[4] Having destroyed any further possibility

---

[4] From January 2019, HM raised approximately $5.4 million in a stock offering at $0.0163 per unit, with each unit containing a share of common stock and warrants to purchase common stock at $0.0163 per share. This resulted in net proceeds of $4.6 million, which were used to pay required redemptions of approximately $1.2 million of non-convertible senior notes and for working capital. In March 2019, HM raised $6 million through another stock offering of preferred shares and warrants. The March preferred share price was at a conversion ratio of 16,666.67 of common per preferred share or $.006 per common share after conversion. As part of the terms of the offering, HM agreed to amend the terms of the January offering to reduce the exercise price of each warrant from $0.0163 to $0.01 per share. This resulted in net proceeds of $4.135 million. HM used the net proceeds of that offering to further pay down non-convertible senior notes and for expenses.

for HM to access the capital markets in any meaningful way, these amounts did nothing to further HM's or MP's business and merely temporarily staved off creditors that were pressuring HM for payment.

130.    The events in this section "The D&Os Had Caused HM to Cut Off Its Access to Capital and Creditors Demanded Payment" are referred to herein as the "**Reckless Capital Cut Off**."

**B.  The MP D&Os Recklessly Allowed an MP Data Breach**

131.    After all its capital had dried up, the MP D&Os bought MP further problems. In 2019, the MP Officers caused a data breach at MP because MP failed to password-protect or encrypt information on some of its servers. The breach exposed many of its customers' personal information, including their personal credit card numbers and expiration dates, email addresses, and billing information. Although a security researcher had warned Lowe earlier that the database was exposed in May 2019, Lowe failed to act on the information, and allowed the data to remain exposed for months. When another security researcher warned Lowe of the breach again on August 18, 2019, Lowe ignored the email. MP only took the database offline a few days later when a reporter from TechCrunch reached out to Lowe for comment. As it turned out, the data had been exposed since April 25, 2019.

132.    After the data breach was publicly exposed, MP issued a boilerplate statement that they were "working diligently to investigate the scope of this incident and its potential impact on our customers." Yet the Derelict MP Directors caused MP to do little, if anything, to investigate the breach. Shortly thereafter, Lowe took an unexplained leave of absence from the company beginning on September 1, 2019, leaving others to address the crisis. Lowe continued to receive a reduced salary and his benefits from MP, even as he abandoned the company in its final days. The

D&Os dragged their feet in conducting their investigation of the breach and missed several reporting deadlines concerning the breach, and the breach only further destroyed MP's reputation. The events in this section "The MP D&Os Recklessly Allowed an MP Data Breach" are referred to herein as the "**Grossly Negligent Data Breach**."

### C. HM D&Os Allow Farnsworth to Use Remaining MP Assets for Personal Gain

133.    In mid-2019, HM and MP were on the verge of total collapse. Rather than safeguarding the value of HM and MP for its creditors, Farnsworth sought to first transfer valuable MP customer and other information to a new venture/application pursuant to a project dubbed "Ted's Most Excellent Adventure," and then "buy-out" what remained in MP.

134.    "Ted's Most Excellent Adventure" sought to create a new application separate from the old MP application, known as MoviePass 2 or MP2 (with the old MP now being MP1). Farnsworth intended to start a new venture, and not to benefit MP. "Ted want[ed] everything fresh and clean … out [of] the muck that is MP." He acknowledged to Krishnan that his plan for the MP2 app was to take whatever information he could from MP, including by contacting its current and former customers to try to bring them to MP2.

135.    Farnsworth hired several consulting firms, on HM's and MP's dime, to develop the new app. In June 2019, Farnsworth requested that Damon, then the CFO of HM and MP, sign two contracts, one with Silent Disclosure Inc. ("**SDI**") to help develop a new application, and another contract with Chargebee to develop the application itself. Farnsworth made clear to SDI that "mp1 and mp2 will never intersect. Period." SDI's orders from Farnsworth were to develop MP2 and ignore the implications for MP – "the current care and feeding of mp1 is between him and Mitch [Lowe]." Accordingly, they were directed to continue "any efforts to secure information from MP1

about credentials and other key items" for use in MP2. Farnsworth told SDI to advance cash to

Chargebee, resulting in expenses for the development of MP2 that HM and MP could not afford.

136.   Damon warned that the contracts were unwise because MP did not know what work

would be performed or who would own the finished product. He also warned that HM and MP had

no spare cash to fund the project. On July 9, 2019, Damon advised HM's BOD that HM's cash

position was so dismal that there would be almost nothing left after covering the July 15th payroll.

Nevertheless, Farnsworth demanded that Damon "[s]end the money today." The D&Os were

aware that "Ted's Most Excellent Adventure" was not in the best interests of MP but did nothing

to stop Farnsworth's self-dealing.

137.   While Farnsworth was working to obtain MP's customer information, he was also

actively working on a bid for HM's assets, including MP. On August 12, 2019, Farnsworth, while

still the CEO and a director of HM (and a director of MP), submitted a bid to HM on behalf of his

company, MoviePass Entertainment Limited Hong Kong ("**MPHK**"), which he sent to Singh to

present to HM's BOD. Pursuant to that agreement, HM would have been required to license MP's

technology to MPHK and assign its customer lists and subscription receivables to MPHK. Neither

Singh nor anyone else objected to a bid for HM being submitted by an acting officer and director.

138.   A month later, on September 13, 2019, HM finally announced it was forming a

strategic review committee to assess such transactions. Three days later, Farnsworth resigned all

of his positions at HM, and, implying that he had not already proposed a transaction a month

earlier, announced that he "would be leading a formal bid for and relating to all assets of [HM],

including [MP], MoviePass Films and Moviefone." Fried became the chairman of the HM BOD

after Farnsworth resigned in September 2019.

139.     Farnsworth's self-serving conduct was nothing more than a failed attempt at an

asset grab that drained resources from HM and MP and diverted attention from critical HM matters

during this period. The Derelict HM Directors failed to take any steps to stop this chain of events.

Fried, a real estate attorney with no financial or management experience, knew that HM and MP

were struggling financially but did not bother to take any steps to salvage what value remained.

Singh received Farnsworth's offer letter while Farnsworth was still an officer and director of HM

but failed to take action to remedy the blatant conflict of interest the situation presented. The entire

HM BOD stood by silently as Farnsworth sought to divert all remaining value to himself. Together

with Farnsworth, the other HM D&Os caused the destruction of whatever value remained in MP.

140.     The events in this section "HM D&Os Allow Farnsworth to Use Remaining MP

Assets for Personal Gain" are referred to herein as the "**Farnsworth Asset Self-Dealing**."

**D. The D&Os' Failures and Improper Tactics Lead to Time Consuming and Costly
Consumer Lawsuits and Government Investigations**

141.     Predictably, beginning in late 2018 and through 2019, as a result of the onslaught

of legal and public relations problems, the D&Os' attention turned to handling these crises.

142.     Beginning in late 2018, MP was sued in consumer lawsuits in various jurisdictions

for its failures to provide customers what it had promised. In November 2018, MP, HM,

Farnsworth, Benson, and Lowe were sued in a class action lawsuit in the United States District

Court for the Northern District of California under various common law and California consumer

protection statutes, as well as for a RICO conspiracy, for severely limiting the movies consumers

could see. In February 2019, MP and HM were sued in a class action lawsuit in the United States

District Court for the Southern District of New York for violation of New York consumer

protection laws and related claims. In that action, subscribers alleged they purchased annual MP

subscriptions under the premise that they would have unlimited access to movies but were rarely

51

able to access movies when they wanted to see them. Both complaints were later amended to add additional plaintiffs that allegedly experienced similar problems.

143.    In addition, MP was subject to various investigations by the FTC. As noted above, the FTC opened an investigation into MP after Lowe publicly claimed that MP was tracking its customers in violation of its privacy policy. The FTC later investigated MP's attempted billing of subscribers who did not affirmatively opt out when MP switched to a capped plan in August 2018. Later, the FTC opened a further investigation into MP's marketing and billing practices, which included investigating the April 2018 password disruption, as well as other attempts to purposely prevent or discourage heavy users from using the service, such as the undisclosed "trip wire." Once the 2019 data breach was publicly disclosed, the FTC began investigating that as well.

144.    MP's tactics also caught the attention of governmental agencies in New York and California. The New York Attorney General opened an investigation into MP's marketing and advertising practices in April 2018, which continued throughout 2019. District attorneys from various jurisdictions in California opened their own similar investigations, centered on the voluminous consumer complaints and MP's failure to provide the services advertised and its failure to abide by its terms of use when continually making changes to their plans.

145.    The many investigations and lawsuits were caused directly by the misconduct of the HM Officers, the MP Officers, the Primary HM Directors and the Primary MP Directors, and the oversight failures of the Derelict HM Directors and the Derelict MP Directors. The D&Os diverted HM's resources (countless hours and millions of dollars were spent defending these claims) and the D&Os' attention from important issues that needed to be addressed at HM and MP.

146.    The events in this section "The D&Os' Failures and Improper Tactics Lead to Time

Consuming and Costly Consumer Lawsuits and Government Investigations" are referred to herein

as the "**Lawsuit and Investigations Problems**."

## VI.    DAMAGES CAUSED TO HM AND TO MP

147.    As a result of the Reckless MP Transfers, Board Abrogation, Farnsworth Asset

Self-Dealing, Insider Deal Misdeeds, Uncontrolled Expenses, Reckless Capital Cut Off, and

Lawsuit and Investigations Problems in breach of their duties of care, loyalty and good faith, the

HM D&Os caused HM to suffer damage in excess of $187 million from the Reckless MP

Transfers.

148.    In addition, in breach of their duties of care, loyalty and good faith, the HM D&Os

caused HM to suffer damages in the amount of the value of MP, HM's primary asset, through

Board Abrogation, Farnsworth Asset Self-Dealing, Insider Deal Misdeeds, Uncontrolled

Expenses, Reckless Capital Cut Off, and Lawsuit and Investigations Problems.

149.    In the alternative, in breach of their duties of care, loyalty and good faith, the HM

D&Os caused HM to suffer damages from each of the HM acts and omissions described herein in

the form of lost cash, lost opportunities, and the loss of other value from MP.

150.    As a result of the Reckless Pricing Model, Big Three Failure, Data Analytics

Misconduct, Uncontrolled Expenses, Board Abrogation, Grossly Negligent Data Breach,

Farnsworth Asset Self-Dealing, Lawsuit and Investigations Problems of the D&Os, in breach of

their duties of care, loyalty and good faith, the MP D&Os caused MP to suffer damages based on

the loss of MP's value, in an amount to be determined at trial.

151.    In the alternative, in breach of their duties of care, loyalty and good faith, MP D&Os

caused MP to suffer damages from each of the MP acts and omission described herein in the form

of lost cash, lost opportunities, and the loss of other value from MP.

## COUNT 1
### BREACH OF FIDUCIARY DUTIES OF LOYALTY, CARE
### AND GOOD FAITH AGAINST HM OFFICERS:
### FARNSWORTH, BENSON AND KRISHNAN

152.     The Trustee repeats and re-alleges the allegations set forth above.

153.     The HM Officers each owed fiduciary duties of loyalty, care and good faith to HM.

154.     The HM Officers each were grossly negligent and reckless, did not act in the best interest of HM and its creditors, and/or did not exercise an informed business judgment with the due care and consideration that an ordinarily prudent person in a like position would use under similar circumstances by engaging in and/or authoring the Reckless MP Transfers, the Reckless Capital Cut Off, the Farnsworth Asset Self-Dealing, the Insider Deal Misdeeds, the Uncontrolled Expenses and the Lawsuit and Investigations Problems, and by harming and/or failing to safeguard HM's primary asset, MP, from the MP Officer Acts and Failures (defined below) (collectively, the "**HM Officer Acts and Failures**").

155.     The HM Officers each breached their fiduciary duties to HM by engaging in and/or authorizing the HM Officer Acts and Failures that failed to protect the interest of HM to the detriment of HM. Farnsworth and Benson furthered these breaches by simultaneously acting as officers and/or directors of HM and MP.

156.     By engaging in and/or authorizing the HM Officer Acts and Failures, the HM Officers each acted without reasonable inquiry or information, with improper motives and/or as a result of conflicts of interest.

157.     By engaging in and/or authorizing the HM Officer Acts and Failures, the HM Officers committed acts or omissions that the HM Officers believed to be or should have known were contrary to the best interests of HM or that involved the absence of good faith.

158.     By engaging in and/or authorizing the HM Officer Acts and Failures, the HM Officers closed their eyes to the HM's affairs and completely failed to act.

159.     By engaging in and/or authorizing the HM Officer Acts and Failures, the HM Officers committed breaches of fiduciary duty that were the proximate cause of damages to HM. As a result, The HM Officers are liable to the Trustee for damages in an amount to be determined at trial.

**COUNT 2**
**BREACH OF FIDUCIARY DUTIES OF LOYALTY**
**AND GOOD FAITH AGAINST PRIMARY HM DIRECTORS**
**FARNSWORTH AND GADIYARAM**

160.     The Trustee repeats and re-alleges the allegations set forth above.

161.     The Primary HM Directors each owed fiduciary duties of loyalty and good faith to HM.

162.     By engaging in and/or authorizing the Reckless MP Transfers, the Board Abrogation, the Reckless Capital Cut Off, the Farnsworth Asset Self-Dealing, the Insider Deal Misdeeds, Uncontrolled Expenses and the Lawsuit Investigations Problems, and by harming and/or failing to safeguard HM's primary asset, MP, from the MP Officer Acts and Failures (defined below)  (collectively, the "**HM Director Acts and Failures**"), the Primary HM Directors failed to actively monitor and exercised a sustained and systematic failure of oversight of HM.

163.     By engaging in and/or authorizing the HM Director Acts and Failures, the Primary HM Directors ignored or failed to consider material information and made decisions that were not reasonably informed, and they acted with a conscious and intentional disregard of their responsibilities to HM, and with an intentional dereliction of duty to HM.

164.     By engaging in and/or authorizing the HM Director Acts and Failures, the Primary HM Directors consciously disregarded their duties demonstrated by, among other things, their

repeated failure to act in the face of a known duty to act, their failure to inquire about obvious and known problems, and their complete and intentional disregard for their responsibilities as directors.

165.    By engaging in and/or authorizing the HM Director Acts and Failures, the Primary HM Directors acted with conflicts of interest and for their own improper benefit. Farnsworth also had a conflict of interest by acting as a director and officer of HM and a director of MP.

166.    By engaging in and/or authorizing the HM Director Acts and Failures, the Primary HM Directors ignored or failed to consider material information or make reasonable inquires and acted without reasonable inquiry and/or material and necessary information, and/or with improper motives and/or as a result of conflicts of interest.

167.    By engaging in and/or authorizing the HM Director Acts and Failures, the Primary HM Directors were grossly negligent and reckless and did not act in the best interest of HM and its creditors, and failed to protect the interest of HM.

168.    By engaging in and/or authorizing the HM Director Acts and Failures, the Primary HM Directors committed acts or omissions that were contrary to the best interests of HM, involved the absence of good faith, and each knowingly permitted the other to benefit themselves to the detriment of HM.

169.    By engaging in and/or authorizing the HM Director Acts and Failures, the Primary HM Directors committed breaches of fiduciary duty that were the proximate cause of damages to HM. As a result, the Primary HM Directors are liable to the Trustee for damages in an amount to be determined at trial.

## COUNT 3
### BREACH OF FIDUCIARY DUTIES OF LOYALTY
### AND GOOD FAITH AGAINST DERELICT HM DIRECTORS:
### SINGH, SCHRAMM, RALBAG, AND FRIED

170.    The Trustee repeats and re-alleges the allegations set forth above.

171.    The Derelict HM Directors each owed fiduciary duties of loyalty and good faith to HM.

172.    By authorizing, permitting and/or failing to prevent the HM Director Acts and Failures, the Derelict HM Directors failed to actively monitor and exercised a sustained and systematic failure of oversight of HM.

173.    By authorizing, permitting and/or failing to prevent the HM Director Acts and Failures, the Derelict HM Directors ignored or failed to consider material information and made decisions that were not reasonably informed, and they acted with a conscious and intentional disregard of their responsibilities to HM, and with an intentional dereliction of duty to HM.

174.    By  authorizing, permitting and/or failing to prevent the HM Director Acts and Failures, the Derelict HM Directors consciously disregarded their duties demonstrated by, among other things, their repeated failure to act in the face of a known duty to act, their failure to inquire about obvious and known problems, and their complete and intentional disregard for their responsibilities as directors.

175.    By authorizing, permitting and/or failing to prevent the HM Director Acts and Failures, the Derelict HM Directors ignored or failed to consider material information or make reasonable inquires and acted without reasonable inquiry and/or material and necessary information and/or with improper motives.

176.     By authorizing, permitting and/or failing to prevent the HM Director Acts and Failures, the Derelict HM Directors were grossly negligent and reckless and did not act in the best interest of HM and its creditors, and failed to protect the interest of HM.

177.     By authorizing, permitting and/or failing to prevent the HM Director Acts and Failures, the Derelict HM Directors committed acts or omissions that were contrary to the best interests of HM, involved the absence of good faith, and knowingly permitted Farnsworth and Gadiyaram to benefit themselves to the detriment of HM.

178.     By authorizing, permitting and/or failing to prevent the HM Director Acts and Failures, the Derelict HM Directors committed breaches of fiduciary duty that were the proximate cause of damages to HM. As a result, the Derelict HM Directors are liable to the Trustee for damages in an amount to be determined at trial.

## COUNT 4
## BREACH OF FIDUCIARY DUTIES OF LOYALTY, CARE AND GOOD FAITH AGAINST MP OFFICERS: BENSON AND LOWE

179.     The Trustee repeats and re-alleges the allegations set forth above.

180.     The MP Officers each owed fiduciary duties of loyalty, care and good faith to MP.

181.     The MP Officers each were grossly negligent and reckless, did not act in the best interest of MP and its creditors and/or did not exercise an informed business judgment with the due care and consideration that an ordinarily prudent person in a like position would use under similar circumstances by engaging in and/or authoring the Reckless Pricing Model, the Big Three Failure, the Data Analytics Misconduct, the Uncontrolled Expenses, the Grossly Negligent Data Breach, the Farnsworth Asset Self-Dealing, and the Lawsuit and Investigations Problems (collectively, the "**MP Officer Acts and Failures**").

182.    The MP Officers each breached their fiduciary duties to MP and engaging in and/or authorizing the MP Officer Acts and Failures that failed to protect the interest of MP to the detriment of MP. Benson furthered these breaches by simultaneously acting as an officer of MP and HM.

183.    By engaging in and/or authorizing the MP Officer Acts and Failures, the MP Officers each acted without reasonable inquiry or information, with improper motives and/or as a result of conflicts of interest.

184.    By engaging in and/or authorizing the MP Officer Acts and Failures, the MP Officers committed acts or omissions that they believed to be or should have known were contrary to the best interests of MP or that involved the absence of good faith.

185.    By engaging in and/or authorizing the MP Officer Acts and Failures, the MP Officers closed their eyes to the MP's affairs and completely failed to act.

186.    By engaging in and/or authorizing the MP Officer Acts and Failures, the MP Officers committed breaches of fiduciary duty that were the proximate cause of damages to MP. As a result, The MP Officers are liable to the Trustee for damages in an amount to be determined at trial.

### COUNT 5
### BREACH OF FIDUCIARY DUTIES OF LOYALTY
### AND GOOD FAITH AGAINST PRIMARY MP DIRECTORS:
### FARNSWORTH AND LOWE

187.    The Trustee repeats and re-alleges the allegations set forth above.

188.    The Primary MP Directors each owed fiduciary duties of loyalty and good faith to MP.

189.    By engaging in and/or authorizing the Reckless Pricing Model, the Big Three Failure, the Data Analytics Misconduct, the Uncontrolled Expenses, the Board Abrogation, the Grossly Negligent Data Breach, the Farnsworth Asset Self-Dealing, the Lawsuit and Investigations Problems (collectively, the "**MP Director Acts and Failures**"), the Primary MP Directors failed to actively monitor MP and exercised a sustained and systematic failure of oversight of MP.

190.    By engaging in and/or authorizing the MP Director Acts and Failures, the Primary MP Directors ignored or failed to consider material information and made decisions that were not reasonably informed, and they acted with a conscious and intentional disregard of their responsibilities to MP, and with an intentional dereliction of duty to MP.

191.    By engaging in and/or authorizing the MP Director Acts and Failures, the Primary MP Directors consciously disregarded their duties demonstrated by, among other things, their repeated failure to act in the face of a known duty to act, their failure to inquire about obvious and known problems, and their complete and intentional disregard for their responsibilities as directors.

192.    By engaging in and/or authorizing the MP Director Acts and Failures, the Primary MP Directors acted with conflicts of interest and for their own improper benefit. Farnsworth also had a conflict of interest by acting as a director and officer of HM and a director of MP.

193.    By engaging in and/or authorizing the MP Director Acts and Failures, the Primary MP Officers ignored or failed to consider material information or  make reasonable inquires  and acted without reasonable inquiry and/or material and necessary information, and/or with improper motives and/or as a result of conflicts of interest.

194.    By engaging in and/or authorizing the MP Director Acts and Failures, the Primary MP Directors were grossly negligent and reckless and did not act in the best interest of MP and its creditors and failed to protect the interest of MP.

195.     By engaging in and/or authorizing the MP Director Acts and Failures, the Primary MP Directors committed acts or omissions that were contrary to the best interests of MP, involved the absence of good faith, and knowingly permitted Farnsworth to benefit himself to the detriment of MP.

196.     By engaging in and/or authorizing the MP Director Acts and Failures, the Primary MP Directors committed breaches of fiduciary duty that were the proximate cause of damages to MP. As a result, the Primary MP Directors are liable to the Trustee for damages in an amount to be determined at trial.

## COUNT 6
### BREACH OF FIDUCIARY DUTIES OF LOYALTY AND GOOD FAITH AGAINST DERELICT MP DIRECTORS: KELLY, SCHRAMM AND STIPP

197.     The Trustee repeats and re-alleges the allegations set forth above.

198.     The Derelict MP Directors each owed fiduciary duties of loyalty and good faith to MP.

199.     By authorizing, permitting and/or failing to prevent the MP Director Acts and Failures, the Derelict MP Directors failed to actively monitor MP and exercised a sustained and systematic failure of oversight of MP.

200.     By authorizing, permitting and/or failing to prevent the MP Director Acts and Failures, the Derelict MP Directors ignored or failed to consider material information and made decisions that were not reasonably informed, and they acted with a conscious and intentional disregard of their responsibilities to MP, and with an intentional dereliction of duty to MP.

201.     By authorizing, permitting or failing to prevent, the MP Director Acts and Failures, the Derelict MP Directors consciously disregarded their duties demonstrated by, among other

things, their repeated failure to act in the face of a known duty to act, their failure to inquire about obvious and known problems, and their complete and intentional disregard for their responsibilities as directors

202.    By authorizing, permitting and/or failing to prevent the MP Director Acts and Failures, the Derelict MP Directors ignored or failed to consider material information or make reasonable inquires and acted without reasonable inquiry and/or material and necessary information, and/or with improper motives.

203.    By authorizing, permitting and/or failing to prevent the MP Director Acts and Failures, the Derelict MP Directors were grossly negligent and reckless and did not act in the best interest of MP and its creditors, and failed to protect the interest of MP.

204.    By authorizing, permitting and/or failing to prevent the MP Director Acts and Failures, the Derelict MP Directors committed acts or omissions that were contrary to the best interests of MP, involved the absence of good faith, and also knowingly permitted Farnsworth to benefit himself to the detriment of MP.

205.    By authorizing, permitting and/or failing to prevent the MP Director Acts and Failures, the Derelict MP Directors committed breaches of fiduciary duty that were the proximate cause of damages to MP. As a result, the Derelict MP Directors are liable to the Trustee for damages in an amount to be determined at trial.

## COUNT 7
## CORPORATE WASTE OF HM
## AGAINST THE HM D&OS

206.     The Trustee repeats and re-alleges the allegations set forth above.

207.     In connection with the HM Officer Acts and Failures and HM Director Acts and Failures, the HM D&Os failed to properly consider the interests of HM. The HM D&Os caused HM to irrationally squander, give away and/or waste valuable corporate assets due to these activities.

208.     The HM Officer Acts and Failures and HM Director Acts and Failures were so one-sided that no businessperson of ordinary, sound judgment could conclude that HM received adequate consideration in connection with the transactions. The HM Officer Acts and Failures and HM Director Acts and Failures were so egregious or irrational that they could not have been based on a valid business purpose or assessment of the corporation's best interests.

209.     Each of these acts of corporate waste harmed HM by proximately causing damages relating to the specified act and by destroying its business. As a result, the HM D&Os are liable to the Trustee for damages in an amount to be determined at trial.

## COUNT 8
## CORPORATE WASTE OF MP
## AGAINST THE MP D&OS

210.     The Trustee repeats and re-alleges the allegations set forth above.

211.     In connection with the MP Officer Acts and Failures and MP Director Acts and Failures, the MP D&Os failed to properly consider the interests of MP. The MP D&Os caused MP to irrationally squander, give away and/or waste valuable corporate assets due to these activities.

212.     The MP Officer Acts and Failures and MP Director Acts and Failures were so one-sided that no businessperson of ordinary, sound judgment could conclude that MP received adequate consideration in connection with the transactions. The MP Officer Acts and Failures and MP Director Acts and Failures were so egregious or irrational that they could not have been based on a valid assessment of the corporation's best interests.

213.     Each of these acts of corporate waste harmed MP by proximately causing damages relating to the specified act and by destroying its business. As a result, the MP D&Os are liable to the Trustee for damages in an amount to be determined at trial.

## COUNT 9
## UNJUST ENRICHMENT ASSERTED BY HM AGAINST
## GADIYARAM AND FARNSWORTH

214.     The Trustee repeats and re-alleges the allegations set forth above.

215.     HM conferred a benefit on Gadiyaram and Farnsworth from Farnsworth Asset Self-Dealing and the Insider Deal Misdeeds.

216.     Gadiyaram and Farnsworth appreciated, accepted and retained the benefit of the Farnsworth Asset Self-Dealing and the Insider Deal Misdeeds that they each received. In addition,

they appreciated, accepted and retained the benefit that they each received indirectly from the transfers made for their ultimate, personal benefit.

217.    It would be inequitable and unjust for Gadiyaram and Farnsworth to retain the respective benefits that they each received in connection with the Farnsworth Asset Self-Dealing and the Insider Deal Misdeeds. Specifically, Gadiyaram and Farnsworth caused each of these transfers to be made for little or no consideration at a time when HM was insolvent, under-capitalized, and/or would be unable to pay its debts as they became due. Further, Gadiyaram and Farnsworth breached their fiduciary duties of loyalty, care, and good faith in causing to make these transfers.

218.    Accordingly, the benefits Gadiyaram and Farnsworth received from the Farnsworth Asset Self-Dealing and the Insider Deal Misdeeds should be recovered by the Trustee from Gadiyaram and Farnsworth.

## COUNT 10 THROUGH COUNT 15
## OBJECTIONS TO CLAIMS

219.    The Trustee repeats and re-alleges the allegations set forth above.

220.    The Trustee alleges the following as to the proofs of claim filed by certain D&Os in the Debtors' cases (the "**Claims**"):

221.    **Count 10 Against Farnsworth Relating to HM Claim 96**. The Trustee hereby objects to HM Claim No. 96 filed by Farnsworth against HM in the amount of $60,450.62 because: (a) the Claim should be disallowed under 11 U.S.C. § 502(b); (b) the Claim should be equitably subordinated under 11 U.S.C. § 510(c)(1); (c) the Claim is subject to set off, recoupment, and/or withholding based upon the affirmative causes of action asserted against the Trustee in this action; and/or (d) the Claim contains insufficient documentation to support the Claim.

222.    **Count 11 Against Gadiyaram Relating to HM Claim 103**. The Trustee hereby objects to the HM Claim 103 filed by Gadiyaram against HM in the amount of $93,750.00 because: (a) the Claim should be disallowed under 11 U.S.C. § 502(b); (b) the Claim should be equitably subordinated under 11 U.S.C. § 510(c)(1); (c) the Claim is subject to set off, recoupment, and/or withholding based upon the affirmative causes of action asserted against the Trustee in this action; and/or (d) the Claim contains insufficient documentation to support the Claim.

223.    **Count 12 Against Kelly Relating to MP Claims 105 and 109**. The Trustee hereby objects to MP Claim 109 (amendment of MP Claim 105) filed by Kelly against MP in the amount of $300,953.73 because: (a) the Claim should be disallowed under 11 U.S.C. § 502(b); (b) the Claim should be equitably subordinated under 11 U.S.C. § 510(c)(1); (c) the Claim is subject to set off, recoupment, and/or withholding based upon the affirmative causes of action asserted against the Trustee in this action; and/or (d) the Claim contains insufficient documentation to support the Claim. The Trustee also objects to Claim 105 and alleges it should be disallowed on the grounds set forth in (a) through (e) above.

224.    **Count 13 Against Kelly Relating to MP Claims 102 and 106**. The Trustee hereby objects to MP Claim 106 (amendment of MP Claim 102) filed by Kelly against MP in the amount of $200,000 because: (a) the Claim should be disallowed under 11 U.S.C. § 502(b); (b) the Claim should be equitably subordinated under 11 U.S.C. § 510(c)(1); (c) the Claim is subject to set off, recoupment, and/or withholding based upon the affirmative causes of action asserted against the Trustee in this action; and/or (d) the Claim contains insufficient documentation to support the Claim. The Trustee also objects to Claim 102 and alleges it should be disallowed on the grounds set forth in (a) through (e) above.

225.   **Count 14 Against Stipp Relating to MP Claim 104**. The Trustee hereby objects to MP Claim 104 filed by Stipp against MP in the amount to $25,000 because: (a) the Claim should be disallowed under 11 U.S.C. § 502(b); (b) the Claim should be equitably subordinated under 11 U.S.C. § 510(c)(1); (c) the Claim is subject to set off, recoupment, and/or withholding based upon the affirmative causes of action asserted against the Trustee in this action; and/or (d) the Claim contains insufficient documentation to support the Claim.

226.   **Count 15 Against Lowe Relating to MP Claim 100**. The Trustee hereby objects to MP Claim 100 filed by Lowe on behalf of the Lowe Family Trust against MP in the amount to $250,000 because: (a) the Claim should be disallowed under 11 U.S.C. § 502(b); (b) the Claim should be equitably subordinated under 11 U.S.C. § 510(c)(1); (c) the Claim is subject to set off, recoupment, and/or withholding based upon the affirmative causes of action asserted against the Trustee in this action; and/or (d) the Claim contains insufficient documentation to support the Claim.

## TOLLING OF LIMITATIONS

227.   All statutes of limitations applicable to the Trustee's claims were tolled for two years after the filing of HM's and MP's bankruptcy case on January 28, 2020.

## PRAYER

WHEREFORE, the Trustee requests judgment against the Defendants as follows:

- awarding monetary damages in an amount to be proven at trial;

- awarding pre-judgment interest at the maximum rate allowable by law and/or equity;

- awarding reasonable attorney's fees and costs to the extent permissible by applicable law;

- authorizing set off, recoupment, and/or withholding against each of the Claims;

- disallowing each of the Claims;

- equitably subordinating claims under § 510(c)(1) each of the Claims; and

- granting such other and further relief as the Court deems just and proper.

Dated:  June 5, 2020

Respectfully submitted,

REID COLLINS & TSAI LLP

*/s/ Angela J. Somers*
Angela J. Somers
Yonah Jaffe
810 Seventh Avenue, Suite 410
New York, New York 10019
212.344.5200
asomers@reidcollins.com
yjaffe@reidcollins.com

-and-

P. Jason Collins
Morgan Menchaca
1301 S. Capital of Texas Hwy, Suite 300
Austin, Texas 78746
512.647.6100
jcollins@reidcollins.com
mmenchaca@reidcollins.com

*Counsel for Alan Nisselson, as Chapter 7 Trustee
of Helios and Matheson Analytics, Inc.,
MoviePass, Inc., and Zone Technologies, Inc.*